756 So.2d 463 (2000)
STATE of Louisiana
v.
Martin Luther TEXADA.
No. CR99-1009.
Court of Appeal of Louisiana, Third Circuit.
February 2, 2000.
*467 Earl Taylor, District Attorney, Opelousas, LA, Counsel for Plaintiff/Appellee.
Edward K. Bauman, Louisiana Appellate Project, Lake Charles, LA, Counsel for Defendant/Appellant.
Court composed of Judge JOHN D. SAUNDERS, Judge BILLIE COLOMBARO WOODARD, and Judge ELIZABETH A. PICKETT.
WOODARD, Judge.
The trial court convicted Martin Luther Texada of two counts of attempted first degree murder, one count of conspiracy to commit first degree murder, one count of distribution of cocaine to a person under eighteen years of age, one count of solicitation of a minor to distribute cocaine, and five charges of committing acts in association with a street gang. The jury returned a guilty verdict on all charges. The trial court sentenced him to a total of three hundred fifteen years, of which one hundred eighty years are without benefits, and a fine of $100,000.00. We are asked to decide whether the evidence is sufficient to sustain the convictions, whether the total sentence is excessive, and whether a mistrial was warranted. Finding the only error to be the trial court's imposition of a $100,000.00 fine for Count V, soliciting a child under eighteen to distribute cocaine, which was not authorized by the penalty provision for that offense, we affirm and amend the sentence.

FACTS
At the time of the incidents at issue, Martin Texada led an Opelousas street gang known as the "5/9 Bloods" or "Bossier Street Hustlers." Members wore red bandannas and used his residence as the gang's "hang out." On a daily basis, members sold illegal substances from his residence and stored a significant supply of cocaine in the trailer beside it. The two unrelated incidents below are at issue in this case.
On October 25, 1996, Martin Texada arranged to sell sixty dollars worth of drugs to Sandra Guillory, who, unbeknownst to him, was working undercover with the Opelousas Police Department. Shortly thereafter, he gave fifteen-year-old gang member, Louis Daniel Freeman, three rocks of cocaine and told him to bring them to Guillory. After completing the transaction, Freeman returned to Martin Texada's residence and gave him the money he received from Guillory.
On the night of June 12, 1997, in retaliation for disrespect shown to members of his gang, Martin Texada ordered gang members, Freeman and Lyle Raheem Jones, to go to the Greenwood area in search of certain individuals and to shoot whoever they saw because they might be the "certain individuals." He gave Freeman and Lyle Raheem Jones guns to carry out their mission and ordered gang member, Keith Jermaine Henry, to drive the car. Complying with his orders, Freeman and Lyle Raheem Jones fired at a group of people, which resulted in life-threatening gunshot wounds to Raven Richard and Liza Jackson.
On August 29, 1997 by true bill, the State charged Martin Texada, Henry, Lyle Raheem Jones, and Michael McDowell in Counts I and II with attempted first degree murder, violations of La.R.S. 14:27 and 14:30, in Count III with conspiracy to commit first degree murder, violations of La.R.S. 14:26 and 14:30, in Count IV with distribution of cocaine to a person under eighteen years of age, a violation of La. R.S. 40:981(B), and in Count V with solicitation of a minor to distribute cocaine, a violation of La.R.S. 40:981.2. The original indictment, filed July 31, 1997, had charged Martin Texada with Counts I, II, and III, only. The remaining five charges were the same as the five underlying offenses listed above, but additionally charged him with committing the acts for the benefit of, at the direction of, and/or in association with a criminal street gang, with the intent to promote, further, or *468 assist in the affairs of a criminal gang, a violation of La.R.S. 15:1403.
On September 26, 1997, Martin Texada waived a formal reading of the bill of indictment and entered a plea of not guilty to all counts. The parties selected a jury on July 7, 1998, and evidence presentation began on July 14, 1998; however, the court declared a mistrial on July 24, 1998 due to defense counsel's illness. The second trial commenced with jury selection on November 4, 1998. Evidence presentation began on November 12, 1998, and on November 18, 1998, the jury found him guilty as charged on all counts. The trial court ordered a presentence investigation report and on January 29, 1999, it sentenced him on each of Counts I and II to fifty years at hard labor without benefit of probation, parole, or suspension of sentence, with Count II to run consecutively to Count I. On Count III, it sentenced him to thirty years at hard labor to run consecutive to Counts I and II. Sixty years at hard labor and a $100,000.00 fine was imposed for Count IV, to run consecutive to Counts I, II, and III. On Count V, the trial court sentenced him to sixty years at hard labor and ordered him to pay a fine of $100,000.00, to run concurrently with Count IV. On each of Counts VI and VII, he received a twenty-five-year sentence at hard labor without benefits, to run consecutive to all other counts. On Count VIII, the trial court imposed a fifteen-year sentence at hard labor, consecutive to all other counts. On Count IX, he received thirty years at hard labor to run consecutive to all other counts. Finally, on Count X, he received a thirty-year sentence without benefits, to be served consecutive to all other counts. Martin Texada filed a pro se motion for reconsideration of sentence, which the trial court denied on February 17, 1999. Before this court, he seeks review of his convictions and sentences.
Martin Texada claims that the trial court erred in finding him guilty on all counts, because the evidence was insufficient to sustain the convictions; that the sentences imposed were cruel, unusual, and excessive, in violation of La. Const. art. I, § 20, and in denying his motions for mistrial based on other crimes evidence.

LAW

ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the record's face. After reviewing the record, we find two errors patent.
First, the transcript reveals that the trial court failed to state that the sentence on Count V (solicitation of a child under eighteen to distribute cocaine in order to promote gang activity) is to be served at hard labor. It simply imposed a sentence of thirty years without benefit of parole, probation, or suspension of sentence, although, the minutes of sentencing indicate that the trial court did state the sentence was to be served at hard labor. The transcript prevails when it conflicts with the minutes. However, since the offense is necessarily punishable at hard labor, and, if anything, the trial court's failure to state such renders the sentences illegally lenient, this court will not recognize the error.[1]
Second, the trial court imposed an illegally lenient sentence on Count V (soliciting a child under eighteen to distribute cocaine). The penalty provision for that offense requires that the sentence be served without benefit of probation, parole, or suspension of sentence.[2] However, the trial court did not impose such a restriction on his sentence. Since the State is not complaining of this error, it is not recognized.[3]
*469 Additionally, the trial court's imposition of a $100,000.00 fine on Count V (soliciting a child under eighteen to distribute cocaine) was not authorized by the penalty provision for that offense.[4] The penalty provision states nothing regarding the fine imposed. Thus, the trial court erred in imposing a fine for that offense. Accordingly, the sentence imposed for Count V is amended to delete the $100,000.00 fine. Since Martin Texada received the maximum term of imprisonment, it is not necessary to remand for resentencing.

SUFFICIENCY OF THE EVIDENCE
Martin Texada contends that the jury erred in finding him guilty on all counts because the evidence, viewed in a light favorable to the prosecution, was insufficient to sustain the convictions. The State proved most of the elements of the crimes through the testimony of Freeman, Henry, and Kevin Pitre. Martin Texada contends that the testimony of these three individuals must be viewed with extreme caution because they all benefitted from plea bargains in return for their testimony. At trial, the State's witnesses made the jury aware of the plea bargain agreements. Defense counsel put on witnesses to attack the State's witnesses' credibility, questioned them regarding prior inconsistent statements, and the jury found the State's witnesses credible. Since it is the fact finder's role, not the appellate court's, to weigh the witnesses' credibility, we will focus primarily on whether the evidence presented satisfied the elements of the crimes.

TWO COUNTS OF ATTEMPTED FIRST DEGREE MURDER; CONSPIRACY TO COMMIT FIRST DEGREE MURDER (Counts I, II, and III of the Bill)
The State convicted Martin Texada of two counts of attempted first degree murder and conspiracy to commit first degree murder. An attempt is defined in La.R.S. 14:27(A):
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. In order to find a defendant guilty of attempted first degree murder, the defendant is required to have had specific intent to kill.[5] Also applicable is the law of principals, which is defined in La.R.S. 14:24:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Further, the State charged Martin Texada with conspiring with a minor to commit first degree murder. Conspiracy is defined in La.R.S 14:26(A):
Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
At trial, the evidence presented sufficiently supported his convictions for two counts of attempted first degree murder and conspiracy to commit first degree murder. The second paragraph of La. *470 Code Crim.P. art. 26(A) provides, "[i]f the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other."
Freeman classified the 5/9 Bloods as a gang and testified that Martin Texada led the gang "because he's the one mostly tells what to do." Freeman named the following members: Earl West, McDowell, Eddie Texada, Lyle Raheem Jones, Henry, Pitre, John Texada, and Melvin Lewis. At around 12:30 a.m. or 1:00 a.m. on the night of June 12, 1997, Henry, Lyle Raheem Jones, Freeman, and Martin Texada were at Martin Texada's 1744 Bossier Street house. They were discussing a fight which had taken place at the park between "Earl and Big Mel" and Mark Richard. According to Freeman, Earl [West] and Big Mel [Melvin Lewis] were mad about what had happened, and Martin Texada was upset because one of the gang members had been disrespected. Freeman testified that he was "[j]ust talking about we got to go get them n____," referring to Mark Richard, Joe Nathan, and Lorenzo. Lewis and West wanted to go do the shooting, but Martin Texada approached Freeman and Lyle Raheem Jones, wanting them to handle the matter. He then approached Henry and asked him to drive them. When Henry responded, "No, I ain't down with that," with a mean expression, Martin Texada told Henry that he was going to drive the car. He gave Freeman a .45 and Lyle Raheem Jones a .357. Freeman and Lyle Raheem Jones then got into Martin Texada's Geo Prism, driven by Henry, and went to the Greenwood area car wash. Freeman and Lyle Raheem Jones, armed with the guns, ran across the highway to a cement stump. Once they were spotted by one of the people sitting on the porch, the two opened fire. Freeman testified that he fired until his gun was empty and that Lyle Raheem Jones fired about six shots. According to Freeman, they shot these people because Martin Texada told them "to go handle that for him." As Freeman ran back towards the car, the people started firing back. When he met up with Henry and Lyle Raheem Jones, they drove back to Martin Texada's Bossier Street residence. Martin Texada asked Freeman if they had handled it, and Freeman replied affirmatively. He took the guns and when they heard on his scanner that the police chief was coming to Bossier Street, he told Freeman to run and hide in the back, which he did. At the time of the incident, Freeman was sixteen years old and was wearing black shorts, "black and red Jordans," and a red bandanna over his face.
On cross-examination, Freeman testified that Martin Texada did not instruct him to shoot victims Richard and Jackson. According to Freeman, it was dark and he could not see anyone, but Martin Texada had told them to shoot whoever was in the area. Freeman affirmed that he was at the crime scene to kill someone, but he later testified that he did not intend to kill anyone, just to shoot. On redirect, Freeman explained that he was told to look for Mark Richard, Nathan, and Lorenzo and "whoever would be out that might be them and to start letting out fire because that might be them." According to Freeman, he was just following his leader's orders.
Freeman testified that, in exchange for his guilty plea as an adult to two counts of attempted first degree murder and his agreement to testify truthfully at any trial arising out of the case, the State agreed to recommend a sentence of not more than twenty-five years. The State also agreed not to prosecute Freeman for the October 25, 1996 distribution of cocaine charge. Freeman said that he understood that if he lied, the plea agreement would not be honored. Opelousas Police Department Officer Jean Harrison testified that she spoke to Freeman after he was taken into custody for the shootings. Freeman asked for help and Officer Harrison did not make any promises, but said she would speak to the district attorney. Freeman told her of *471 Martin Texada's involvement. The State played a videotape of Freeman's interrogation from July 13, 1997 for the jury during Officer Harrison's testimony.
During Freeman's testimony, he denied telling Christopher Jones, "I'm going to shoot Mark Richard and them because I'm not going to let them shoot me;" however, Christopher Jones testified that Freeman said he was going to protect himself and that two days before the shooting, Freeman requested a gun, but Freeman denied this.
Henry, the driver on the night of the shooting, affirmed his 5/9 Bloods association and that Martin Texada was the leader. According to Henry, if Martin Texada told gang members to do something, they complied without hesitation. Henry testified that a fight had taken place at the park between Lewis and Mark Richard and that a feud existed between Mark Richard and some of the gang members. Lewis and West wanted to "handle their business," but he told them he did not want them out there. Martin Texada said, "[t]hey have some people back here hanging back here on Bossier Street that's riding under my name. What y'all going to do when I'm not around. Y'all need to start handling y'all business." He appointed Freeman to "handle the business" and Lyle Raheem Jones said he would "do something to show him that." Despite Henry's initial resistance, he ordered him to drive the car. Henry drove Freeman and Lyle Raheem Jones to the Greenwood area because of Martin Texada's pressure. According to Henry, the .45 caliber gun belonged to Martin Texada and the .357 magnum belonged to West. Henry saw him give Lyle Raheem Jones a gun and tell him to handle his business. The State asked Henry if he heard Martin Texada's shooting order. Henry only remembered hearing Mark Richard's name. When the three returned to Bossier Street, Henry saw one of the guns given to Martin Texada.
On cross-examination, Henry affirmed that Martin Texada said to shoot Mark Richard, Courtney, and the people that "hung around" him, but Henry did not think this meant any girls. On redirect-examination, the State showed Henry a photograph, marked for identification as S-29, which he testified that it depicted an abandoned house at which Martin Texada, West, and Lewis used to shoot their guns, which were the same guns used in the shooting on July 12, 1997. State's witness, John Sam, identified S-29 as a photograph of his mother's old house. He testified that he went to the property with him and a "few other fellows" a couple of times and they were shooting a rifle and a handgun.
Henry, represented by an attorney, entered into a plea agreement with the State. Henry testified that, in exchange for his guilty plea to two counts of accessory after the fact to attempted murder and his truthful testimony, the State recommended that he receive concurrent sentences. On cross-examination, Henry affirmed that the State told him he would get concurrent five-year sentences. If he breached the agreement, the State would prosecute him as it saw fit and recommend a sentence it deemed appropriate. When defense counsel called Henry as a witness, it asked if the district attorney's office offered him immunity from prosecution. He responded, "Yes, sir, I think so."
Also, Henry stated that prior to entering the plea agreement, he had told his attorney, Mr. Barstow, and others that Martin Texada had nothing to do with ordering him to shoot people and that West told him to "go along with this." On direct-examination, Henry testified that the statement he made to Mr. Barstow in 1997 was not made under oath and was a He. On redirect-examination, Henry explained the circumstances surrounding the statement he gave to Mr. Barstow. He stated that Martin Texada brought him to Mr. Barstow and that Martin Texada had talked to him about an alibi. He stated that he gave Mr. Barstow the story which Martin Texada gave him.
*472 The trial court accepted Christopher Henderson, a forensic chemist with the Acadiana Crime Laboratory, as an expert in the field of forensic science with a particular area of expertise in firearms identification. Mr. Henderson testified that the five .45 spent casings, identified as S-31, A, B, C, D, and E, recovered by Officer Harrison from near a little cement foundation close to where the shootings occurred were fired from the same weapon as some of the casings which Officer Roylis Gallow, an investigator and narcotics agent with the Opelousas Police Department, found in the Wisdom Road house's yard which appeared in the photograph identified as S-29.
Officer Gallow testified that he located forty-three bullet casings at the Wisdom Road house. During Officer Gallow's testimony, the prosecutor referred to the bags containing the casings as S-33 A, B, and C. The State showed Mr. Henderson S-33(A), a bag containing thirty nine millimeter cartridges; S-34, a bag containing nineteen .357 casings; and S-35, a bag containing twelve .45 casings. Mr. Henderson affirmed the thirteen .45 casings (he said there were actually thirteen, not twelve, casings) identified as S-35, which Officer Gallow found outside of town, were fired from the same weapon as the bullets Officer Harrison found at the shooting location. Although S-34 and 35 were not the numbers used during Officer Gallow's testimony, it appears that these are the same casings. Additionally, when the prosecutor initially showed Mr. Henderson the five bags containing the casings Officer Harrison found, he referred to them as 33(1)(E); however, he later referred to them as 31 A, B, C, D, and E. Although there is a discrepancy in some of the numbers used to identify the casings, defense counsel did not raise this as an issue.
Pitre, a former 5/9 Bloods member, also testified that Martin Texada led the gang and that members took orders from him without hesitation. While in prison, Martin Texada told Pitre he "got tired of Lyle Jones and Danny Freeman riding on his dick with 5/9 Bloods" and "it was time for them to handle their business." According to Pitre, Martin Texada told Freeman and Lyle Raheem Jones, "[i]t was time for them to go out there and whatever, whoever was [sic] friends with Mark Richard go out there and shoot everybody [sic] was out there."
Pitre testified that he gave an unsworn recorded statement to Mr. Barstow right after the State incarcerated Martin Texada, but he did not tell the truth. On cross-examination, Pitre testified that Martin Texada gave him "a story" to tell Mr. Barstow on tape. Extensive questioning ensued regarding this statement and the circumstances surrounding it.
When the State entered a plea agreement with Pitre, he was represented by counsel. The State agreed to reduce his aggravated rape charge to carnal knowledge of a juvenile, in exchange for his guilty plea to one count of carnal knowledge of a juvenile and his truthful testimony. The State also agreed to dismiss related charges of second degree kidnaping, possession of a firearm by a convicted felon, and an aggravated oral sexual battery. Further, the State agreed not to file an habitual offender bill against him. On cross-examination, defense counsel elicited testimony that as a part of his agreement with the State, he was to truthfully report what happened.
When recalled as a defense witness, Pitre affirmed that the district attorney's office would have "prepared a grant of immunity" if he testified. Pitre and Henry denied discussing their testimony in jail; however, defense witness, Jerome Thomas, testified about conversations between Pitre and Henry concerning their trial testimony, which he overheard in jail. Thomas said that Henry and Pitre discussed the upcoming trial, the deal the district attorney made with them, their grants of immunity, and its impact on their testimony. He stated they were "plotting" against *473 Martin Texada and that they talked about their testimony on several occasions. Defense witness, James Thomas, also affirmed that Pitre and Henry talked to each other in jail, contradicting Pitre's testimony that the two never talked because he does not like Henry.
As a result of the shooting, two girls, Richard and Jackson, sustained serious injuries. Ms. Richard testified that she was outside her sister Angela Richard's house with Jerome Papillion, Jackson, and Brandon Lindy. Ms. Richard's little brother, Jerome, said: "Look the Texadas." At that point, Ms. Richard started running to the back of the trailer. She was shot in the back and fell on the ground. She stated that she did not see who shot her. Ms. Jackson's testimony about the events preceding the shooting was essentially the same. When she heard Jerome refer to the Texadas, she looked back and saw Freeman shooting. Unsure, she thought she recognized Lyle Raheem Jones. Ms. Jackson started running but was shot in the back and fell.
The trial court accepted Dr. Glenn Granger, the surgeon who treated Richard and Jackson, as an expert in the field of medicine with specialties in traumatic and general surgery. On June 12, 1997, Ms. Richard, nineteen at the time, arrived in the emergency room at 3:02 a.m. after having been shot in the right chest. According to Dr. Granger, the bullet passed within approximately two inches to the right of the heart and was half an inch from the subclavian artery and vein, which is the "large artery and vein coming up the heart going to the right artery." If the subclavian artery had ruptured, Dr. Granger felt she would not have arrived at the emergency room alive. Opelousas City Police Department Officer Donald Thompson said that he retrieved the bullet removed from Richard. In court, the clerk marked the bullet S-36. Mr. Henderson asserted that the bullet was compatible with one fired from a Colt firearm revolver, which could include either a .38, a .38 Special, or a .357.
Dr. Granger testified that Jackson, fifteen at the time of her emergency room arrival, was shot in the left chest and that there was a wound "coming under the clavicle" and a wound "entering the left breast coming out the right side." There were two exit wounds. Besides the lungs, there were injuries to the left breast and soft tissue damage. Dr. Granger characterized Ms. Jackson's injuries as severe and that the bullet's path endangered her life.
Defense witness, McDowell, testified that the day before the shooting, Lyle Raheem Jones, using the same .357 gun, shot a hole in Mark Richard's Cadillac. On a number of occasions, McDowell heard West tell Freeman or Lyle Raheem Jones to "handle their own business." According to McDowell, Martin Texada told West, Mark Richard, and others to "leave the stuff alone." McDowell's testimony concerning the shooting differed significantly from the State's witnesses. He maintained that he, Martin Texada, and Mark Richard had an agreement to just "be cool." He thought everything was "alright." After he got into the car with Lyle Raheem Jones and Freeman, he told them to take him back, and they did. He testified they were going to get Mark Richard at his mother's home. After the conversation in the car, he did not want anything to do with what was happening.
Mark Richard said that he and Martin Texada had talked about ironing out problems concerning other people. According to Mark Richard, neither he nor anyone he knew had problems with Freeman.
Defense witness, West, Martin Texada's brother-in-law, claimed that he did not give Freeman a gun on the night of the shooting and that the police tried to get him to testify against Martin Texada, offering to help with his charges.
At trial, Martin Texada denied ordering anyone's shooting on June 12, 1997. His testimony focused mainly on the value of *474 his automobiles, his other sources of income, and his other businesses.
The evidence, viewed in a light favorable to the State, shows that Freeman and Lyle Raheem Jones were acting under Martin Texada's direction when they fired at a group of people, which resulted in two life-threatening injuries. Although not present at the shooting's scene, Martin Texada directly counseled or procured another person to commit the crime; thus, as a principal, he is guilty of the offense. "A person who aids and abets another in a crime, is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proved at trial."[6] The act of firing into a group of people has been found sufficient to prove specific intent to kill more than one person.[7] Thus, Freeman and Jones acted with the specific intent to kill. Martin Texada also possessed this intent, as evidence existed that his instructions to Freeman and Jones included shooting certain people and whoever was in the area. The evidence also shows that he acted in combination with others for the specific purpose of committing first degree murder. Accordingly, Martin Texada's convictions for two counts of attempted first degree murder and conspiracy to commit first degree murder are affirmed.

DISTRIBUTION OF COCAINE TO A PERSON UNDER THE AGE OF EIGHTEEN; SOLICITING A MINOR TO DISTRIBUTE COCAINE (Counts IV and V of the Bill)
La.R.S. 40:967 proscribes distribution of controlled dangerous substances listed in Schedule II, which includes cocaine. Increased penalties may be imposed when a person, who is at least eighteen, is convicted of distributing cocaine to a person under eighteen years of age, who is at least three years his junior.[8] La.R.S. 40:981.2 forbids persons eighteen or older from soliciting, procuring, or counseling any person under eighteen to distribute or attempt to distribute controlled dangerous substances listed in Schedule I, II, III, IV, or V, which includes cocaine.
Officer Gallow testified that Guillory contacted him on October 25, 1996. She had agreed to do undercover drug work with the Opelousas Police Department. At the time of trial, Guillory's whereabouts were unknown. At Officer Gallow's request, Guillory agreed to contact Martin Texada. Officer Gallow, Officer John James, and Sergeant Dwayne Grimmett were present when Guillory called him, and Officer Gallow taped the conversation. Some statements contained on the tape and in the conversation transcript between Guillory and Martin Texada were deleted before jury presentation. The record contains a redacted audiotape copy, but not the transcript; however, the court reporter transcribed the tape in the record as it played for the jury. In the taped conversation, Guillory asked him if they could meet in forty-five minutes at the gas station by Soileau's Dinner Club and "meet [her] with about sixty." He said that he was going to send somebody there. Officer Gallow recognized Martin Texada's voice on the tape, a voice well-known to him. Officer Gallow gave Guillory marked money and a body microphone. Her purse and vehicle were checked before she departed.
Before leaving Guillory's house, arrangements were made for Captain Trahan to videotape the transaction. The officers followed Guillory to the north end of Opelousas *475 near Soileau's Dinner Club. Officer Gallow monitored the body microphone transmission, but he could not see what was taking place because he was in a vehicle that moved continuously. On cross-examination, Officer Gallow said that Officer James sat in his vehicle's passenger side. Officer James testified that he observed the transaction, yet Officer Gallow moved continuously and could not see what took place. On cross-examination, Officer Gallow affirmed that Guillory received money for food for her child in exchange for her help.
Opelousas Police Department Officer Ronnie Trahan supervised the video surveillance unit, which had the capability of simultaneously recording the transmission from the transmitter. The State introduced the transaction's videotaped recording and played it for the jury while Officer Trahan narrated it. A brown Cadillac drove up and Freeman and McDowell exited. Freeman confirmed that Squirrel (McDowell) drove a "blue Ninety-eight." Officer Trahan also identified John Texada and Darwin Fontenot on the tape. The exchange between Guillory and Freeman occurred very fast, and he explained that this is normally done to avoid attention.
Opelousas Police Department Detective John James testified that he observed the narcotics buy between Guillory and Freeman on October 20, 1996. After the exchange, he took the evidence from Guillory, sealed it, and placed it in storage until it could be transferred to the Acadiana Crime Lab for analysis. The clerk marked the bag S-25. The trial court accepted Loret Rapp, an employee of Acadiana Crime Lab, as an expert in the field of forensic science with a specialty in forensic chemistry. Her tests on the four rocks contained in the bag, identified as S-25, revealed cocaine content.
Freeman testified that, on October 25, 1996, while Martin Texada was on the phone with Sandy [Guillory], she asked him for sixty dollars worth of illegal substance. Martin Texada asked Freeman if he had some, but Freeman told him he did not. While Freeman stood guard, he entered the trailer, used to hide his illegal substance, and cut down some rocks. He handed the rocks to Freeman and told him to bring them to Guillory. Squirrel (McDowell) drove Freeman to the store to meet Guillory. Guillory told Freeman to sit down in her car; once inside, she gave him sixty dollars and he gave her the rocks. Guillory told him if she needed some later she would beep Martin Texada and tell him. After the exchange, Freeman returned to Bossier Street and gave him the money. Freeman, who was fifteen at the time of the transaction, remarked that this was Martin Texada's "dope deal" and that he just went out and did it for him. At trial, the parties stipulated that Martin Texada was born on June 13, 1974, making him twenty-two during the October 25, 1996 drug transaction.
The evidence is sufficient to prove that Martin Texada, twenty-two years old at the time, distributed cocaine to fifteen-year-old Freeman, seven years his junior, and that he procured Freeman to distribute cocaine to Guillory. Thus, these convictions are affirmed.

PROMOTION, FURTHERANCE, OR ASSISTANCE OF CRIMINAL GANG ACTIVITY (Counts VI through X of the Bill)
The indictment's last five counts alleged that the criminal offenses were committed for the benefit of, at the direction of, and/or in association with a criminal street gang, with the intent to promote, further, or assist in the affairs of a criminal street gang, in violation of La. R.S. 15:1403(B). This provision states:
Any person who is convicted of a felony or an attempted felony which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the intent to promote, further, or assist in the affairs of a criminal gang, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the *476 felony or attempted felony of which he or she has been convicted, be imprisoned for not less than one year nor more than one-half of the maximum term of imprisonment provided for that offense.
Criminal street gang is defined in La.R.S. 15:1404:
A. As used in this Chapter, "criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, which has as one of its primary activities the commission of one or more of the criminal acts enumerated in Paragraphs (1) through (8) of Subsection B of this Section or which has a common name or common identifying sign or symbol, whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity.
B. As used in this Chapter, "pattern of criminal gang activity" means the commission or attempted commission of two or more of the following offenses, provided at least one of those offenses occurred after September 7, 1990 and the last of those offenses occurred within three years after a prior offense, and the offenses are committed on separate occasions or by two or more persons:
(1) Aggravated battery or second degree battery as defined in R.S. 14:34 and R.S. 14:34.1.
(2) Armed robbery as defined in R.S. 14:64.
(3) First or second degree murder or manslaughter, as defined in R.S. 14:30, 30.1, and 31.
(4) The sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances, as defined in R.S. 40:961 et seq.
(5) Illegal use of weapons or dangerous instrumentalities, as defined in R.S. 14:94.
(6) Aggravated arson as defined in R.S. 14:51.
(7) Intimidating, impeding, or injuring witnesses; or injuring officers, as defined in R.S. 14:129.1.
(8) Theft, as defined in R.S. 14:67, of any vehicle, trailer, or vessel. Added by Acts 1990, No. 230, § 1.

The trial court accepted Officer Harrison as an expert in the field of investigation and monitoring of gang and juvenile gang activities. She testified that the residence located at 1744 Bossier Street was Martin Texada's and that she targeted him for investigation from 1995 to 1997. The State showed Officer Harrison a series of photographs, taken by her, depicting gang-related graffiti. According to Officer Harrison, S-5-A was a picture of gang-related graffiti on the A & B Quick Stop, located about two blocks away from Martin Texada's residence. The markings "5/9" and "Blood" were on the photograph, as well as "B.S. Hustler," which according to Officer Harrison, means Bossier Street Hustler, an alternate name for the 5/9 Bloods gang. The photograph identified as S-5-B depicted graffiti in the same location. S-5-C was a photograph of graffiti written on a cement slab at the dead end of Bossier Street, several feet away from Martin Texada's house. The graffiti said "5/9," "No Crips," and "BSH." Across the street from his residence was a sign spray painted with "5/9", which was depicted in the photograph labeled S-5-D. S-5-E was a picture of the bleachers at South City Park (Bossier Street is on the north side of town near North City Park). Officer Harrison described the picture's contents:
Q. Where is the 5where are the markings?
A. 5/9.
Q. Okay. And was there also reference to other gangs?
A. Yes, sir.
Q. We're big boys and girls here. Just tell us what it says.
A. Okay. Right here it says uhI think it says "A[] COPS 5/9 Thug."
Q. Okay.

*477 A. To the top it says "F[___]...." Something is marked out right here but it also has "Crips."
The last photograph, S-5-F, also taken at the bleachers at South City Park, contained the markings "5/9 Thug Life." The State showed Officer Harrison pictures of some of the people she observed at Martin Texada's residence. She identified them as McDowell, West, Freeman, Pitre, Henry, Lewis, and Tyrone Johnson. Lyle Raheem Jones, Fontenot, Randy Kennerson, and Christopher Jones were also seen at the house. Officer Harrison kept his house under surveillance for about one and one-half days, during which time she saw known drug users entering and exiting. Martin Texada originally resided in the trailer, but he then moved to the house next door and Johnson began staying in the trailer. Officer Harrison observed a considerable amount of traffic between the trailer and the house. Officer Harrison believed that a gang operated out of leader Martin Texada's residence. The 5/9 Bloods' color was red, and members wore red bandannas. A wooden paddle covered with a red cloth bandanna, bearing the words "Piru Blood," was recovered from gang member John Texada, Martin Texada's brother. Also taken from John Texada was a red and white baseball cap. The bill of the cap said "Bloods" and the back said "5/9." It appears the cap also bore the words "Bossier Street Hustlers" and the name "John."
According to Officer Harrison, Johnson was second in command, but when he left to serve time, McDowell, "Squirrel," took his place. On cross-examination, she testified that she learned this information from interviewing the organization's members.
The police obtained a search warrant for the trailer located at 1744 Bossier Street, and Officer Harrison participated in the search. The State showed Officer Harrison four bags of evidence, identified as S-17, recovered in the search. The first bag contained one large rock or slab (which appeared to Officer Harrison to be cocaine) and razor blades. The second bag contained one rock, and the third bag contained seven large slabs. The fourth bag contained "six cookies in each plastic bag." The police recovered a microwave from the residence, as well as over three hundred dollars found in a sofa pillow. They also seized a weapon and a scale.
The trial court accepted Mr. Kevin Ardoin, of the Acadiana Crime Lab, as an expert in the field of forensic science with a specialty in forensic chemistry. His examination revealed that the four bags contained cocaine and the recovered microwave showed traces of cocaine. According to Mr. Ardoin, the cocaine he examined could have been broken down into 750 to 1500 rocks.
Officer Harrison conducted a video surveillance of Martin Texada's residence on April 30, 1997 and May 1, 1997. Officer Harrison prepared a summary of the activity viewed on the videotape (S-19). She testified that it accurately reflected what she observed on those dates. Officer Harrison described the activity which she observed at Martin Texada's residence during her surveillance. This included strange vehicles driving up, making contact, and leaving immediately as well as people arriving on foot and bicycle, making contact, and leaving immediately. Officer Harrison stated that drug sales are normally conducted in a fast manner with minimal contact between the purchaser and seller. Items are easily passed from hand or mouth to hand, and these were the types of transactions observed on Bossier Street. On cross-examination, Officer Harrison testified that she did not see any controlled dangerous substances and that these people could have been transferring almost anything. However, she also stated that she observed Bossier Street for two years and the activity during the surveillance was typical of drug transactions.
Although he did not refer to the document as S-19, on cross-examination, defense counsel showed Officer Trahan (Officer Harrison's supervisor) a document *478 containing videotaped extracts taken on April 30, 1997 and May 1, 1997. Officer Trahan testified that he prepared the document from handwritten notes which Officers Harrison, Trahan, and Gallow, the officers involved in the surveillance, had submitted and that he was not personally involved in the surveillance. However, Officer Gallow said that he did not take notes during the surveillance.
According to Officer Harrison, Martin Texada had no lawful, gainful employment, but he had several cars. She indicated that he had a late model green Mustang, registered in his mother's name, a 1980 model reddish-orange Grand Prix, an old Cadillac "at one time," a burgundy Ford Mustang, and a tan Geo Prism. Martin Texada explained that his mother owned the green Mustang, although he acknowledged owning the Geo Prism and the 1987 model Mustang, and he said that the Cadillac did not work in 1997. Officer Harrison confirmed that at one point Martin Texada ran a clothing store, but that this only lasted a week or so. According to Officer Trahan, Martin Texada co-owned or operated a store for three or four months. To Officer Harrison's knowledge, West, "Squirrel" McDowell, Freeman, Henry, Johnson, Lewis, Pitre, John Texada, Christopher Jones, Kennerson, Fontenot, and Lyle Raheem Jones did not have lawful, gainful employment, and they were seen continuously on the street in front of Martin Texada's residence, day and night, having frequent contact with strangers. As an expert in the field of gang investigation and activities, Officer Harrison affirmed her convictions that 1744 Bossier Street was the cite of ongoing gang activity and drug trafficking.
Opelousas Police Department Sergeant Lathitia Trahan went to 1744 Bossier Street while on duty on April 2, 1997. Martin Texada granted Sergeant Trahan's request to enter the trailer, but he indicated that he no longer lived there. Sergeant Trahan conducted a search, and each piece of evidence seized was placed into a bag. The first bag contained one off-white rock substance found stuck in the trailer's wall. She found one partially smoked cigar, containing a vegetable like substance, on the speaker in the front room. On the floor near the trailer's front door, she found a syringe with a needle. The fourth bag contained nine off-white rocks with crumbs, five large pieces of off-white rock substances, and crumbs found in the trailer's ceiling insulation. The fifth bag contained off-white powder crumbs found on the sofa bed. A plastic Tylenol bottle and a piece of aluminum foil, containing off-white substances, were found on the kitchen cabinet's north side. On the bed in the kitchen, she found five off-white rocks. The eighth bag contained one clear plastic bag containing four off-white rocks and crumbs and one small ziplock plastic bag, containing five off-white rocks that she found under the stove in the kitchen. The last bag contained off-white rock substances and crumbs that she found in the sofa pillow. Mr. Ardoin testified that seven of the nine bags contained crack cocaine and weighed a total of 39.5 grams, which, according to Mr. Ardoin, was enough to make two to four hundred rocks.
The State showed Freeman a photograph, identified as S-5(C) and previously introduced during Officer Harrison's testimony. Freeman testified that he, Martin Texada, and someone else spray-painted the sidewalk and that S-5(D), which showed the "5/9," the symbol for the gang, was painted by Martin Texada with red spray paint. The State asked him what he generally did on Bossier Street. He responded that he sold drugs for Martin Texada. Starting in 1995, Freeman "hung out" on Bossier Street just about every day, and he never knew Martin Texada to work. However, Martin Texada had four or five cars and carried about two to three thousand dollars. According to Freeman, the gang members and Martin Texada put the illegal substances, which they concealed inside its floors and walls, in the trailer on the side of his house to them. *479 He further stated that the illegal substances he sold came from Martin Texada. An ounce of illegal substance would sell for about sixteen to seventeen hundred dollars, six to seven hundred of which Freeman would keep. Officer Harrison testified that Freeman said that Martin Texada paid him with tennis shoes; however, Freeman denied these payments. The State asked Freeman if Martin Texada got the other thousand dollars, and he replied, "he would get like what he had paid for it or what he wholesaled it to you for." According to Freeman, McDowell, Fontenot, Henry, "Big Mel," and Lyle Raheem Jones, everyone sold drugs out of Martin Texada's house, and this required membership in the organization.
State witness, Eddie Texada, Martin Texada's brother, denied ever having heard of the 5/9 Bloods or the Bossier Street Hustlers. The State asked him to show his tattoos to the jury. The tattoo on his neck had the letters "B," "S," and "H," which he contended stood for "Brothers Stay Hard."
Gang member, Pitre, testified that the 5/9 Bloods' activities were taking place at 1744 Bossier Street and that red bandannas were their symbol. The State asked him what was considered his territory while in the gang, to which he responded, behind the park on Nicole Lane and Martin's car wash. Pitre had a tattoo, referring to 5/9 Bloods, which he got while a member. According to Pitre, the gang's purpose was to "make money, sell drugs," which he did, every day in 1994. He also witnessed Freeman, West, Johnson, McDowell, Fontenot, and Christopher Jones selling drugs on Bossier Street.
Henry, a 5/9 Bloods' gang associate, sold drugs in 1997 "for himself." The drugs would sometimes come from West and as Henry testified, he would sometimes sell drugs on Bossier Street.
State witness Johnson, Martin Texada's good friend, testified that he had heard of the 5/9 Bloods on television, but neither he nor Martin Texada were members. Although Johnson initially stated that he had not heard of the Bossier Street Hustlers, he later affirmed that "BSH" stands for "Bossier Street Hustlers." During questioning, the prosecutor referred to his letter, in which he acknowledged making the following statements: "What's up B.S.H.?... I'm telling y'all before y'all know it I'll be right back in the hood (Bossier) where them 5/9 `G' at." Although certain comments in the letter were directed to Martin Texada, Johnson denied Martin Texada's 5/9 Bloods' membership. He explained that he probably wrote the letter for "about four or five different people." Defense witness, McDowell, testified that the police picked him up numerous times and threatened him with charges; however, if he would agree to place the blame on Martin Texada, they would release him.
We are convinced that the foregoing evidence shows that the 5/9 Bloods was a criminal street gang within the statute's meaning. The gang, comprised of more than three members, had as its primary activity the sale and possession of controlled substances. The attempted first degree murders and conspiracy to commit murder, ordered by Martin Texada as retaliation for disrespect to his gang, were committed in association with the gang with the intent to promote or further its affairs. Likewise, the drug transaction Freeman handled, at Martin Texada's behest, was to benefit the gang with the intent to promote, further, or assist in its affairs. Thus, this assignment of error is meritless. The convictions are affirmed.

EXCESSIVE SENTENCE
Martin Texada contends that his over three-hundred-year sentence is constitutionally excessive. He acknowledges that La.R.S. 15:1403 requires the imposition of consecutive sentences, but he submits that such is not the case for Counts I through V. When sentencing him, the judge stated that there was a manifestation of deliberate cruelty towards the victims. Martin Texada argues that the *480 record is void of any indication that he ordered the shooting of Jackson or Richard. Additionally, he points out that other than his poor health, no mitigating circumstances, such as his family or the lack of drug-related convictions, were considered. Because the attempted murders arose out of the same incident as did the distribution charges, he contends that the trial court erred in imposing consecutive sentences. Furthermore, he feels that he did not deserve the maximum sentences, given the fact that he was "not the worst offender."
A person convicted of attempted first degree murder faces a sentence at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence. Conspiracy to commit first degree murder carries a sentence of not more than thirty years at hard labor. Martin Texada received the maximum sentence, on each of these counts, to run consecutively.
For the crime of distributing cocaine to a juvenile, he received the maximum sentence of sixty years at hard labor and a $100,000.00 fine, to run consecutive to Counts I, II, and III. For soliciting a minor to distribute cocaine, a defendant is to be sentenced to not less than twenty years nor more than sixty years at hard labor without the benefits of probation, parole, or suspension of sentence. He received a sixty-year hard labor sentence and a $100,000.00 fine, to run concurrently with Count IV, but the sentence is illegal in that the $100,000.00 fine should not have been imposed. La.R.S. 40:981 allows the term of imprisonment, authorized by La. R.S. 40:967(B)(1), to be doubled, but it does not mention a fine. This sentence is also illegally lenient in that his parole eligibility was left intact. (See Error Patent Section).
In addition to and consecutive to the punishment prescribed for the felony or attempted felony, La.R.S. 15:1403 allows the court to impose a sentence of not less than one year nor more than one-half of the maximum term of imprisonment provided for the offense. For each of the crimes of promoting affairs of a criminal gang, where the underlying felony was attempted first degree murder, he received the maximum sentence of twenty-five years at hard labor without benefits. He also received the maximum of fifteen years at hard labor for promoting affairs of a criminal gang by conspiracy. For promoting affairs of a criminal gang by distributing cocaine to a minor, he received a thirty-year at hard labor sentence, the maximum. Finally, on Count X, soliciting a minor to distribute cocaine and to promote affairs of a criminal gang, he received a sentence of thirty years without benefits, the maximum. For these offenses, Martin Texada is serving three hundred and fifteen years, with one hundred eighty years without benefits, and he has a $100,000.00 fine.
Generally, maximum sentences are reserved for the worst offenders.[9] The Louisiana Supreme Court has emphasized that the only relevant question on review of a sentence is whether the trial court abused its broad sentencing discretion and not whether the sentence imposed may appear harsh or whether another sentence might be more appropriate.[10]
A sentence is constitutionally excessive if it is grossly out of proportion to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *481 State v. Hogan, 480 So.2d 288 (La. 1985).[11]
Prior to sentencing him, the judge articulated his reasons:
With the three sentencing objectives of deterrence, rehabilitation and public protection in mind, and the provisions of Article 894.1 of the Code of Criminal Procedure in mind, I find that during the period of any type of a suspended sentence that he would probably commit another crime because a history of criminal activity which began when he was a juvenile indicates that given the opportunity he will probably commit some more. Some sentences are mandatory and consequently that makes him ineligible for a suspended sentence. In the aggravating circumstances some of the counts there was a manifestation of deliberate cruelty towards the victims. He used his position as the leader of a gang to facilitate the commission of the offenses. It created a risk of bodily harm to more than one person. He used actual violence and threats during the commission of these crimes or had others do it for him. He committed the crimes or had the crimes committed. There was a retaliation for some activities of potential witnesses of rival gang. A dangerous weapon was used with respect to Raven Richard and Liza Jackson. He's been persistently involved in similar offenses over a period of several years and he was the leader of these criminal activities. Really there is nothing to mitigate against this except he has a health problem but none that would require any special consideration in sentencing. Okay, the defendant has before it a twenty-four year old black male who in seven years as a[sic] adult amassed a substantial criminal record. He has a pending felony, carnal knowledge of a juvenile, which has yet to be disposed of. He has a juvenile record. He was recently convicted of aggravated battery and aggravated escape and was sentenced to prison terms at hard labor for five and ten years respectively. He was convicted of ten felonies in the instant case. The evidence offered at the trial suggested that he was a gang leader and engineered and directed the commission of crimes by other gang members. Considering his criminal record, the fact that two young women almost died because of his conduct, the fact that the evidence suggested an ongoing gang criminal activity or enterprise, public protection appears to be the most viable sentence objective in this case.
With the exception of the two illegally lenient sentences, he received the maximum sentence on each conviction. Consecutive sentences were mandatory for Counts VI through X. However, they were discretionary for Counts I through V, and four of the five sentences were run consecutive to each other. La.Code Crim.P. art. 883 states, in pertinent part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them shall be served concurrently.
The two drug transaction convictions were imposed concurrently with each other; however, the attempted murders convictions were imposed to run consecutively.
Martin Texada has a history of criminal activity and obviously has no regard for human life. As a result of his actions, two innocent victims suffered serious, life-threatening injuries. He led the gang and used his position of authority to influence others to engage in egregious criminal activity. *482 His actions show a gross disrespect for society and life. Thus, a life sentence is not excessive in his case. Three hundred fifteen years is a very lengthy sentence; however, effectively, it is the same as a life sentence without the benefit of parole and is more than appropriate for the atrocities he has inflicted on others. This assignment of error has no merit and is denied.

THE REQUESTS FOR MISTRIAL
Martin Texada contends that the trial court erred in denying defense counsel's motions for mistrial based on the erroneous admission of other crimes evidence. Appellate counsel concedes that La.Code Crim.P. art. 770 does not apply in each of these instances because the remarks were made by witnesses, not the judge, district attorney, or court official. Thus, he relies on La.Code Crim.P. art. 771, which states:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
The first remark at issue occurred when State's witness, Officer Ronnie Trahan, testified that Martin Texada engaged in dog fighting for money. The State asked Officer Trahan if Martin Texada had any lawful employment other than briefly being the operator or co-owner of a store. Officer Trahan replied:
I know that from the information that was received in the intelligence that was acquired, that Mr. Texada, if I'm not mistaken, at least rented a couple of buildings with the intent, I think, of trying to start up a business or further his business interests. And I know that he did have some dogs that they would fight, and I think he fought those dogs for money to bring in income.
Defense counsel objected, arguing a mistrial was warranted because the problem could not be cured by admonition. The prosecutor argued that the comment was unsolicited because he asked about lawful employment. Believing dog fighting to be a misdemeanor, the trial court found the comment "to be about as innocuous as if he would have said he was speeding thirty-five in a twenty-five mile an hour zone." When the trial resumed the following day, defense counsel informed the trial court that dogfighting is a felony and because society detests dogfighting, the comment could not be erased from the jurors' minds. The trial court adhered to its earlier ruling, denying the mistrial motion. Martin Texada implies that the trial court should have admonished the jury. Specifically, he states: "Even after defense counsel informed the trial court that dog-fighting was a felony, the trial court still denied counsel's request for mistrial nor did it admonish the jury in accordance with Art. 771."
"Although an impermissible reference to another crime deliberately elicited of a witness by the prosecutor would be imputable to the state and would mandate a mistrial, unsolicited and unresponsive testimony is not chargeable against the state to provide a ground for mandatory *483 reversal of the conviction."[12] Officer Trahan's answer did not respond to the prosecutor's question regarding lawful employment. Thus, a mistrial was unwarranted in this instance. Likewise, the trial court had no duty to admonish the jury absent a defense counsel request.
In State v. Love,[13] the defendant claimed that the trial court erred in denying his motion for a mistrial and should have admonished the jury to disregard the remark. During defense counsel's examination, a police officer testified that the defendant had been sent to reform school as a child. Again, defense counsel moved for a mistrial, which the trial court denied. This court first noted that La.Code Crim.P. art. 770 did not apply because a testifying police officer is not an "official." Citing La.Code Crim.P. art. 771, this court emphasized admonishment must be requested by the defendant or the state and found that without such a request, the trial court was not required to do so. This court additionally found that the trial court's failure to admonish the jury did not prejudice the defendant because, at best, the statement implied another crime and did not direct reference to another crime. Considering the substantial evidence of Martin Texada's guilt, the failure to admonish the jury to disregard testimony that he benefitted from dog fighting was harmless error.
Martin Texada also complains about Freeman's testimony that he and Martin Texada spray-painted the gang's symbol on a sign and that drugs were sold from Martin Texada's residence. Defense counsel moved for a mistrial based on the reference to other crimes. The trial court issued the following ruling:
Let the record show the jury has been removed from the courtroom. As I appreciate this particular statute, it deals with evidence of other crimes. It may be a charged crime and it may be an uncharged crime. It can be an uncharged crime which becomes an element of the overall pattern. You can onlyyou can charge just one crime, as I appreciate it, under the statute and may have fifty uncharged crimes as being necessary elements to meet the three or more. This is different from other crimes evidence which would generally come under the old KIP exceptions. It has nothing to do with that. These crimes under the KIP exception require the Prieur notices. We're dealing with elements of crimes. Those are handled by responses to the request for a bill of particulars to more fully inform the defendant of the nature and cause of the crime. And that's where we are right now. The defendant in this particular case has been informed through an answer by the State to the defendant's request for a bill of particulars concerning these other crimes. I do not consider them to be the types of crimes that require Prieur notices or Prieur hearings. I have a feeling that there's probably some divergent ideas regarding this [sic] particular aspects of this statute. This is my considered opinion of the statute at this time.
Martin Texada contends that if the trial court's ruling is correct, then La.R.S. 15:1401, which is the section designating the Chapter as the "Louisiana Street Terrorism Enforcement and Prevention Act," should be found unconstitutional on its face because it is overly broad, vague, and admits highly prejudicial other crimes evidence, circumventing State v. Prieur[14] and La.Code Evid. art. 404(B). We assume defense counsel is attacking La. R.S. 15:1403 and 15:1404, as they are the statues at issue in this case.
*484 As discussed previously, one of the elements of La.R.S. 15:1403 is that the felony be committed for the benefit of, at the direction of, or in association with any criminal street gang. To prove a violation of La.R.S. 15:1403, the State must prove the existence of an organization, association, or group of three or more persons which has as its primary activity one or more of a list of enumerated offenses, one of which is the sale of controlled dangerous substances. Alternatively, the State may show that the organization, association, or group has a common name, sign, or symbol and that its members, individually or collectively, engage in or have engaged in a pattern of criminal gang activity. Since the offenses are essentially elements of La.R.S. 15:1403, they are not other crimes evidence and, thus, require no Prieur notice.
In State v. Cole,[15] the defendant, convicted of possession of stolen goods, contended that a mistrial should have been declared when a witness commented that the defendant and his brother took a tool box and tools from her utility shed. Specifically, the witness testified that the Coles asked if they could have the tools and toolbox, and she told them no. Without further prompting, the witness stated that the Coles "took all of that regardless."[16] This court found that the evidence was properly admitted "because it related to conduct that constituted an integral part of the act or transaction that was the subject of the proceeding."[17] To prove the essential crime elements, the state had to show that the goods were stolen. This court found that the trial court properly denied the mistrial motion.
The testimony regarding the sale of drugs from his residence was necessary to meet the definition of "criminal street gang" and the trial court did not err in denying his mistrial motion on this ground. Additionally, the testimony, regarding the gang's symbol painted on the sidewalk and a sign, was relevant to show the existence of the gang's identifying symbol, as well as his association with the gang.
Martin Texada challenges the constitutionality of La.R.S. 15:1401, claiming it is overly broad, vague, and admits highly prejudicial other crimes evidence in violation of State v. Prieur[18] and La.Code Evid. art. 404(B). Although this was not raised as a ground for defense counsel's mistrial motion, at the start of the first trial, defense counsel filed a motion to quash, claiming that La.R.S. 15:1403, et seq. is unconstitutional, as it is vague and ambiguous. (The Prieur argument was not raised in the motion). Court minutes dated July 7, 1998 indicate that the motion was denied.
In State v. Hookfin,[19] [sic] the fourth circuit refused to consider the defendant's challenge to the constitutionality of La. R.S. 14:130.1 because it was not raised in a motion to quash or in a motion in arrest of judgment. The fourth circuit relied on State v. Henry.[20] Disagreeing with the fourth circuit, the supreme court remanded the case for consideration of the defendant's claim:
This case is remanded to the Fourth Circuit Court of Appeal for consideration of the defendant's challenge to the facial validity of LSA-R.S. 14:130.1. This court has consistently held that the facial unconstitutionality of a statute on which a conviction is based is an error discoverable by the mere inspection of pleadings and proceedings, without inspection of the evidence, which is subject to appellate review under LSA-C.Cr.P. art. 920, even though the defendant did *485 not raise the issue in the trial court and did not comply with the assignment of error procedure in LSA-C.Cr.P. art. 844 or with the contemporaneous objection rule of LSA-C.Cr.P. art. 841. State v. Green, 493 So.2d 588, 590 (La.1986); State v. Lee, 364 So.2d 1024 (La.1978); State v. Wrestle, Inc., 360 So.2d 831 (La.1978); State v. Stewart, 325 So.2d 828 (La.1976), cert. denied, 425 U.S. 997, 96 S.Ct. 2213, 48 L.Ed.2d 822 (1976); State v. Williams, 322 So.2d 177 (La. 1975); State v. Dillard, 320 So.2d 116 (La.1975).[21]
Considering the supreme court's order in Hoofkin, Martin Texada's claim may be properly before the court; however, Defense counsel's one line argument is, "If the trial court is correct, then it is submitted that La.R.S. 15:1401 is unconstitutional on its face as it is overly broad, vague, and admits highly prejudicial other crimes evidence that by circumventing State v. Prieur,[22] and La.C.E. art. 404(B)." La. R.S. 15:1401 simply designates the Chapter as the "Louisiana Street Terrorism Enforcement and Prevention Act." Although counsel does not specify which statutes in the Chapter he is challenging, we assume he is referring to La.R.S. 15:1403 and 15:1404, because they require proof of other crimes and they are the statutes at issue in this case. Martin Texada's claim that the statutes are overly broad and vague is insufficiently briefed and is not considered.[23] However, defense counsel's argument that the statutes admit prejudicial other crimes evidence, circumventing Prieur, presents a more narrow issue to review. Thus, we will address the Prieur claim as it applies to La.R.S. 15:1403 and 15:1404.
As discussed previously, in order to prove a violation of La.R.S. 15:1403, the State must prove the existence of an organization, association, or group of three or more persons, which has as its primary activity one or more of a list of enumerated offenses. Alternatively, the State may show that the organization, association, or group has a common name, sign, or symbol and its members individually or collectively engage in or have engaged in a pattern of criminal gang activity. Thus, the State is required to prove the commission of at least one of the underlying criminal offenses listed in La.R.S. 15:1404 to establish a violation of La.R.S. 15:1403. When the other crimes evidence forms an integral part of the crime, no Prieur notice is required.[24] Martin Texada's claim that these statutes are unconstitutional because they allow circumvention of State v. Prieur,[25] and La.Code Evid. art. 404(B) is meritless.
The third instance Martin Texada raises occurred during direct-examination of his witness, Gary Tromblay. Defense counsel asked Mr. Tromblay why he filed a charge against Johnson, and he responded:
I filed it, Mr. Barstow, for three chief reasons: Number one, he lied at his trial that he had ever been convicted of any felony. As we found out in Texas he was convicted for the crime of aggravated robbery which is akin to armed robbery in Louisiana. Secondly, I've also found out through the police that this shooting was anything but an accident and that in fact he shot Mr. Miquel Keys who was the victim in this case at the direction of this defendant, Martin Texada, because he wasn't following orders, Mr. Barstow.
*486 Although defense counsel's request for a mistrial was denied, the trial court instructed the jury to disregard the last comment. It further advised defense counsel to be careful about the questions he asked. In his brief, Martin Texada does not argue the insufficiency of that admonishment; rather, he states that the trial court erred in denying the various mistrial motions. A mistrial is granted only if the trial court is satisfied that admonition is not sufficient to assure the defendant a fair trial.[26]
In State v. Maze,[27] during defense counsel's questioning, state witness Detective McComic mentioned the defendant's prior arrest for an unrelated offense. Specifically, the detective stated, "Yes, I've arrested her before on burglary.... I know her well." Defense counsel moved for a mistrial. The trial court found the response unresponsive and found mistrial discretionary, not mandatory. The trial court chose instead to admonish the jury. In finding no error in the trial court's ruling, this court first noted that the detective's response was made without elaboration. Secondly, we noted the trial judge admonished the jury, which satisfied it that they would disregard the remark. Citing State v. Tribbet,[28] this court found that the state could not be penalized for testimony which the defense elicited. Finally, this court held that the trial did not abuse its wide discretion.
We reach the same result. The testimony concerning the other crime was not elaborative. The defense counsel elicited it, and the trial court admonished the jury. There is no indication that the trial court abused its discretion in denying the mistrial motion. Accordingly, this claim is denied.
As mentioned previously, defense counsel concedes that La.Code Crim.P. art. 770 does not apply, because the remarks were all made by witnesses; however, Gary Tromblay is an Assistant District Attorney. This situation calls into question whether art. 770 would apply rather than art. 771, since a prosecutor made the comment. In State v. Chapman,[29] the defendant moved for a mistrial on two occasions during a city court clerk's testimony. The first instance occurred during the state's questioning, and the second occurred during defense counsel's cross-examination. This court found that the clerk's remarks did not specifically refer to the defendant's other crimes. Additionally, the court found that the clerk was a "witness," rather than a "court official," and La.Code Crim.P. art. 771 applied rather than art. 770. This court stated, "Ms. Davis' position in the 14th Judicial District Court was no different from any other witness. The court placed her under oath and subjected her to rigorous cross-examination. The fact that she was a clerk with the Sulphur City Court does not transform her into a court official in the 14th JDC."[30] Although Gary Tromblay is a prosecutor in St. Landry Parish, he appeared as a defense witness, not as a court official. Thus, this claim is analyzed under La.Code Crim.P. art. 771. We find that the trial court's admonition to the jury adequately preserved a fair trial for Martin Texada.
Finally, Martin Texada points to a fourth mistrial request when the State used an exhibit to display the 5/9 Bloods' hierarchy with his name at the top. At the start of the trial's third day, defense counsel objected as follows:
MR. BARSTOW: Your Honor, I'd like to file a motion for a mistrial at this time based on the following observations: Your Honor, I enter my objection *487 to the experts designating Martin Texada as the head of a gang entitled the 5/9 Bloods because it would have affected on the guilt or innocence of the defendant. However, this board that the prosecution has erectedwhich was erected and standing and its review of the jury at all times and right now when they placed it, the people of the 5/9 Bloods if they want to prove to be 5/9 Bloods, Martin Luther Texada they placed at the top, the top page. This has been in view of the jury since the inception of this trial. It's highly prejudicial and it maintains a reference that, you know, no matter what's said, they're going to remember this particular board with Martin Texada. I think thisthis observation, along with your observation, that experts cannot establish guilt and what they were trying to do is establish if Martin Texada was a head and by putting this board in front of him, the prosecution is maintaining this hierarchy, so to speak, as Martin Texada as head of the 5/9 gang. There's been absolutely no proof to that. There's no proof to thatno proof that it's been established to that fact, your Honor.
The trial court felt that the matter could be handled by admonishing the jury that the display had nothing to do with evidence. When the jury returned to the courtroom, the trial court did not admonish them. The trial court ordered that the board be entered into evidence for the purpose of the mistrial motion, but removed it from the jury's view.
La.Code Crim.P. art. 775 provides that:
A mistrial may be ordered, and in a jury case the jury dismissed, when:
(1) The defendant consents thereto;
(2) The jury is unable to agree upon a verdict;
(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;
(4) The court finds that the defendant does not have the mental capacity to proceed;
(5) It is physically impossible to proceed with the trial in conformity with law; or
(6) False statements of a juror on voir dire prevent a fair trial.
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.
At the time of the motion, Officers Harrison and Trahan had both testified that they determined that Martin Texada led the gang. A considerable amount of testimony later established this fact. Thus, the chart's display to the jury did not deprive him of a fair trial.
In a similar issue before the second circuit, State v. Sloan,[31] the defendant argued that a mistrial should have been granted because a danger of unfair prejudice to the defendant resulted when the jury viewed photographs of the deceased victim's body for an inordinate amount of time. The defendant felt that the prolonged showing may have created an inference of culpability. Defense counsel's request for a mistrial came after the exhibit was left facing the jury and one juror asked that the photographs be moved. The court noted that the photographs were properly admitted into evidence and had already been viewed by the jury. The court found that the defendant did not suffer "substantial prejudice sufficient to *488 deprive him of the reasonable expectation of a fair trial."[32] Thus, the court found that no violation of La.Code Crim.P. art. 775 occurred and that the trial court did not abuse its discretion in denying the motion. Here, the trial court did not abuse its discretion in denying the mistrial motion, and this claim, as well as the other three raised in this assignment of error, are denied. Further, defense counsel asserts that even if mistrial was unwarranted on any individual challenge, the cumulative effect of each alleged error deprived Martin Texada of a fair trial. For the reasons discussed in addressing each error, this argument is meritless.

CONCLUSION
Martin Texada's convictions and sentences are affirmed. However, the sentence imposed for Count V (soliciting a minor to distribute cocaine) is amended to delete the imposition of a $100,000.00 fine and affirmed as amended.
AFFIRMED IN PART AND AFFIRMED AS AMENDED IN PART.
NOTES
[1] See State v. Boyd, 94-641 (La.App. 5 Cir. 12/28/94); 649 So.2d 80.
[2] La.R.S. 40:981.2(C).
[3] State v. Hines, 95-111 (La.App. 3 Cir. 10/4/95); 663 So.2d 199, writ denied, 95-2686 (La.2/9/96); 667 So.2d 528.
[4] La.R.S. 40:981.2(C).
[5] See State v. Brooks, 499 So.2d 741 (La.App. 3 Cir.1986), appeal after remand, 520 So.2d 931 (La.App. 3 Cir.1987).
[6] State v. Texada, 98-1647 (La.App. 3 Cir. 5/5/99); 734 So.2d 854, [State v. Texada, 98-1647 (La.App. 3 Cir. 5/5/99); 734 So.2d 854 involves crimes unrelated to the ones at issue in this case] citing State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
[7] See State v. Butler, 618 So.2d 572 (La.App. 2 Cir.), writ denied, 624 So.2d 1226 (La.1993) [defendant yelled gang slogans and fired five to eight shots at a crowd of people].
[8] See La.R.S. 40:981(B).
[9] State v. Banks, 95-1210 (La.App. 3 Cir. 6/25/97); 699 So.2d 418.
[10] State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
[11] State v. Lobato, 603 So.2d 739, 751 (La. 1992), appeal after remand, 621 So.2d 103 (La.App. 2 Cir.1993).
[12] State v. McKinney, 31,611 (La.App. 2 Cir. 2/24/99); 728 So.2d 1009, 1013, citing State v. Thompson, 597 So.2d 43 (La.App. 1 Cir.), writ denied, 600 So.2d 661 (La.1992).
[13] 602 So.2d 1014 (La.App. 3 Cir.1992).
[14] 277 So.2d 126 (La.1973).
[15] 94-1070 (La.App. 3 Cir. 2/1/95); 649 So.2d 1214.
[16] Cole, 649 So.2d at 1219.
[17] Id. at 1220.
[18] 277 So.2d 126 (La.1973).
[19] 601 So.2d 320 (La.App. 4 Cir.1991).
[20] 443 So.2d 657 (La.App. 3 Cir.1983).
[21] State v. Hoofkin, 596 So.2d 536 (La.1992).
[22] 277 So.2d 126 (La.1973).
[23] See Uniform Rules, Courts of Appeal, Rule 2-12.4.
[24] See State v. Broussard, 95-792 (La.App. 3 Cir. 12/6/95); 664 So.2d 835, citing La.Code Evid. art. 404(B)(1), State v. Prieur, 277 So.2d 126 (La.1973) and State v. Goza, 408 So.2d 1349 (La.1982).
[25] 277 So.2d 126 (La.1973).
[26] La.Code Crim.P. art. 771.
[27] 596 So.2d 218, 220 (La.App. 3 Cir.), writ denied, 604 So.2d 963 (La.1992).
[28] 415 So.2d 182 (La.1982).
[29] 625 So.2d 1351 (La.App. 3 Cir.1993), writ denied, 93-2995 (La.3/11/94); 634 So.2d 402.
[30] Id. at 1354.
[31] 29,787 (La.App. 2 Cir. 9/24/97); 701 So.2d 995, writ denied, 97-2601 (La.2/6/98); 709 So.2d 731.
[32] Id. at 999.