734 So.2d 854 (1999)
STATE of Louisiana, Appellee,
v.
Martin Luther TEXADA, Defendant-Appellant.
No. 98-1647.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1999.
*856 Richard Phillip Ieyoub, Baton Rouge, Donald J. Richard, Asst. Dist. Atty., Earl Taylor, Dist. Atty., for State of La.
Edward K. Bauman, Abita Springs, for Martin Luther Texada.
Before: DOUCET, C.J., COOKS and PICKETT, JJ.
DOUCET, Chief Judge.
The Defendant, Martin Luther Texada, appeals his sentence and conviction on charges of aggravated battery and aggravated escape.
The Defendant was an inmate housed in the St. Landry Parish Jail on December 25, 1997. At around midnight, the time when the prisoners were told to go into their cells for the night, the Defendant and two other inmates, Jerome Thomas and Jason Edwards, hid in the shower area to wait for the arrival of the two guards, who would be coming into their cell block to perform a head count. The inmates were usually told to "rack up"[1] at 10:30 but, because it was Christmas, they were allowed to stay up until midnight. When the two jailers went into the cell block to perform a head count, the three inmates, armed with metal rods which had been pried loose from night stands in their cells, came out of the showers and began to yell at the guards, demanding keys. One of the guards, Deputy Stelly, sought cover under a nearby table and the other deputy, Deputy Bonvillian, got down on the floor. The deputies were unarmed. Two inmates, Edwards and Thomas, stood watch over the guards while the Defendant went to look for the keys in the control room. The Defendant returned to the cell block three times, more or less, to get instructions as to the location of the keys. While waiting for the Defendant to find the keys, Jason Edwards threatened Deputy Stelly and struck him with the metal rod. Jerome Thomas kicked Deputy Bonvillian twice. No major injuries were sustained by either of the deputies. There was testimony adduced at trial that the three inmates had conspired to escape on the night before, Christmas Eve, but they had changed their plans because the guard on duty that night was a big man who carried his nightstick when he made his rounds in the various cell blocks.
After getting the master key, the inmates locked the two guards in the day room in block C. They remained there for over three and a half hours until they were released by a guard working on the second floor, who had become suspicious at around 3:00 a.m. when he realized he hadn't seen them. There was testimony adduced that, before leaving the cell block, the Defendant opened his cell and offered his cell mate, Kirt Antoine, a chance to escape, but Antoine declined. Because the guards were locked up there were no other guards to supervise the inmates on the third floor and some of the inmates in the other blocks remained in the day areas of their cells blocks instead of going to their cells for the night.
The escapees were caught and the Defendant was charged by bill of information with one count of aggravated battery, a violation of La.R.S. 14:34, and with one count of aggravated escape, a violation of La.R.S. 14:110. At his arraignment on April 17, 1998, the Defendant waived formal arraignment and the reading of the bill of information and entered a plea of not guilty to both charges. A trial on the merits began June 22, 1998 and on June *857 24, 1998, the jury rendered guilty verdicts on both charges. On August 21, 1998, the Defendant was sentenced on the aggravated battery charge to serve five years at hard labor and on the aggravated escape charge to serve ten years at hard labor to run consecutive with each other.
The Defendant appeals asserting three assignments of error.

SUFFICIENCY OF THE EVIDENCE
The Defendant asserts that the evidence presented at trial was not sufficient to support guilty verdicts to the charges brought against him.
In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt.

1. Aggravated Battery

The Defendant first asserts that the evidence at trial was not sufficient to convict him of aggravated battery.
La.R.S. 14:33 defines the offense of battery:
Battery is the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another.
La.R.S. 14:34 states that aggravated battery is "a battery committed with a dangerous weapon."
That statute further provides that "Whoever commits an aggravated battery shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than ten years, or both."
To convict a defendant of aggravated battery, the prosecution must prove that the defendant intentionally used force or violence upon the victim, that the force or violence was inflicted with a dangerous weapon and that the dangerous weapon was an instrumentality used in a manner likely to cause death or great bodily harm. State v. Brooks, 499 So.2d 741 (La.App. 3 Cir.1986). After reviewing the record, we are convinced that the evidence adduced at trial is sufficient to carry this burden.
Deputy Stelly, one of the jailers on the third floor of the St. Landry Parish Jail on the night of the incident, testified at trial that Jason Edwards, Jerome Thomas and Martin Texada, were all housed on the third floor of the jail in cell block 3C on December 25, 1997. At midnight, the two jailers on duty, Mike Stelly and Andrew Bonvillian, called out "rack up" on their PA system to each of the four cell blocks on the third floor. The deputies on duty had a television monitor which allowed them to watch the prisoners and the control panel in the control room informed them when a door was open or closed. The doors in cell block 3A would automatically lock when the prisoners went into their cells but, for all of the other cell blocks, it was necessary to press down a button to lock the doors. Deputy Stelly testified that the prisoners usually take their time to go to bed and have to be told several times to "rack up." That night, cell blocks A, Band D did not go to bed right away, but cell block C did. The deputy testified he thought this was unusual but thought the prisoners were just tired. The deputies entered cell block C first to see if the prisoners were in the correct cells and to take out the trash. Deputy Stelly stated at trial that he had taken about three steps inside the cell block when he turned and saw three men come out of the bathroom with pipes in their hands. Deputy Stelly, having previously been severely beaten by two inmates, became very scared. At first Deputy Stelly testified that all three of the prisoners had pipes in their hands but later said that two of them, Jason Edwards and Jerome Thomas, definitely had pipes in their hands. When asked what he did after he first saw these prisoners, Deputy Stelly replied that he said "Oh, my God, not again" and ran under a table. Deputy Bonvillian was out in the open about five feet away from Deputy Stelly.
*858 After he sought cover under the table, the prisoners started asking the jailers for keys. Deputy Stelly testified that the Defendant was with the other two prisoners but walked out to go to the control room then returned and said that he could not find the keys. Before the Defendant left the cell block to go to the control room, Jason Edwards hit Deputy Stelly with the rod. Later in the trial it was established that Deputy Stelly was hit on the forearm, approximately two to four inches from the elbow. Deputy Stelly sustained a little cut for which he did not seek medical treatment. Deputy Stelly also testified that Jason Edwards swung the rod at him about five other times while he was underneath the table. There were chairs surrounding the table which could be moved a little bit, and he used them to protect himself. After the Defendant came back the first time saying that he could not find the keys, Edwards and Thomas began yelling and swinging pipes at the deputies. Deputy Bonvillain asked if he could put his hands up and get up but Edwards started screaming profanities at him and kicked him a couple of times on the left side. Edwards also kicked Deputy Stelly twice in his side and swung at him again saying to him, "I told you to shut up too" and "I'll bash you [sic] head in." Deputy Stelly said that the Defendant ran out of the room at least four times in search of the keys. On one occasion, the Defendant ran into the room and told Edwards and Thomas to empty out their pockets. After the Defendant found the key, the escapees offered to let Kirk Antoine, the Defendant's cell mate, go with them, but he declined. Then the three prisoners left, shutting the door behind them and leaving the deputies in the cell block day room without any means of communication.
On cross-examination, Deputy Stelly testified that neither he nor Deputy Bonvillian brought a flashlight, a nightstick or pepper spray with them to do the headcount that night. Deputy Stelly testified that he never brought the nightstick or the mace with him to do the headcount. He later stated that the inmates were locked inside their cells when they went into the cell blocks. On cross examination, Deputy Stelly again said that the three prisoners all had something in their hands and that he saw this from six or seven feet away. When it was called to his attention that during direct examination he had said that two of the prisoners had pipes for sure, Deputy Stelly replied that he was scared and could not recall whether he had seen anything in the Defendant's hands. Deputy Stelly clarified during cross-examination that he had been hit one time with the pipe and kicked twice. He said that he was certain he saw Deputy Bonvillian get kicked one time but he did not see him get hit with the pipe.
The next witness to testify regarding the battery and the escape was Deputy Bonvillian, the other jailer on the third floor on the night of the escape. Deputy Bonvillian was employed for six months with the Sheriff's Office and he testified that he received no formal training before starting his job as a jailer. He stated that he started work on his floor and was never given any written procedures to follow. The procedures that he followed were the ones learned from the people with whom he worked. While being questioned about procedures, Deputy Bonvillian was asked whether he checked the bathroom before he went into the cell block and he said that he had not checked it the night of the escape. He also stated that he had trouble seeing into the window because it was high up and he is short.
Deputy Bonvillian testified that, about midway into the cell block, he saw something moving out of the bathroom out of the corner of his eye. When he turned around he saw the Defendant, Edwards and Thomas come out of the bathroom. He recalled that two of them were armed with metal rods. The deputy identified State Exhibit 5 as one of the rods which had been either in the hands of Edwards *859 or Thomas.[2] He also stated that the rods came off of the night stands located in the cells. When asked if the Defendant had anything in his hands the deputy replied, "I didn't see it if he did." Deputy Bonvillian testified that he saw Jason Edwards hit Deputy Stelly on the forearm with the rod and swing at Deputy Stelly later. He stated that no one ever swung the pipe at him but that Edwards kicked him twice, once in the arm and once in the side. Deputy Bonvillian also testified that the escapees threatened the deputies the whole time and that they were screaming obscenities. Deputy Bonvillian testified that he was frightened. It was the testimony of Deputy Bonvillian that Edwards was the only one who hit and kicked and that Thomas just stood off and watched while the Defendant was going back and forth from the cell block to the control room looking for the key.
The next witness to testify at trial was Justin Tezano, an inmate housed in cell block C on the third floor of the St. Landry Parish jail. He testified that on the night of the escape, Thomas, Edwards and the Defendant hid in the showers and when the officers came into the cell block the three of them came out of the bathroom. Mr. Tezano said that Thomas and Edwards had something in their hands but the Defendant did not. He testified that he did not see the three hit anybody with the rods, but he did see Thomas try to hit Deputy Stelly while he was under the table and he saw Edwards kicking Deputy Bonvillian. When asked why Deputy Bonvillian was lying on the floor, Mr. Tezano replied, "Sh-. They was [sic] scared."
On cross-examination, the witness again testified that he did not see Edwards hit Deputy Stelly with the pipe but he did witness Thomas bang on the table while the deputy was underneath the table.
Jason Edwards, one of the accused in the case, was called as a witness for the defense. He testified that the Defendant paid the guard for the main key. He further testified the Defendant told him if he wanted to be free Edwards had to act like he was roughing up the guards so that it would look like everyone in C block did not know about it. Edwards stated that the Defendant told him not to hurt the guards but to just stand there and tell them to get down on the floor. When asked what he was told was the purpose of having these rods, Edwards stated, "In case they wouldn't go down with the plan." He denied that he hit either guard with the pipe and he also denied that he kicked the deputies.
On cross-examination, Edwards testified that the rods came from his cell and Jerome Thomas' cell. When asked by the State why he had testified on direct examination that they had the rods in case the guards "wouldn't go down with the plan," the witness stated he didn't say that and that they did not intend to use the rods.
The defense called several other prisoners from cell block C on the third floor on the night of the escape. They all said that they saw Edwards and Thomas holding the rods but they did not see the Defendant holding anything. They also testified that they did not see Edwards or Thomas hit the deputies with the rods.
The Defendant contends that the State failed to prove the elements of aggravated battery because they did not offer any evidence that the Defendant used a dangerous weapon or made any physical contact with the dangerous weapon. However, the state may prove a defendant guilty by showing that he served as a principal to the crime by aiding another. State v. Smith, 513 So.2d 438 (La.App. 2 Cir.1987); La.R.S. 14:24.
Principals are defined by La.R.S. 14:24 as:

*860 All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Those persons who knowingly participate in the planning or execution of the crime are principals. State v. Pierre, 93-0893 (La.2/3/94); 631 So.2d 427. A person who aids and abets another in a crime is just as liable as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. Watson, 397 So.2d 1337 (La.1981), cert. denied, 454 U.S. 903, 102 S.Ct. 410, 70 L.Ed.2d 222 (1981).
Although the testimony presented at trial seems to suggest that the Defendant never possessed a dangerous weapon, the evidence is sufficient to prove that all three inmates discussed plans to escape from jail during the night in question and that all three played a significant role in effectuating the escape. Although Jason Edwards testified at trial that the Defendant instructed him that his part of the plan was to stand there and tell the guards to get down on the floor while not hurting the guards, Edwards also testified that he was told that the purpose of the metal rods was: "In case they wouldn't go down with the plan." The evidence shows that there was a definite plan in the execution of which all three inmates knowingly participated and that during the encounter with the deputies, force was used by one of the inmates on Deputy Stelly. Therefore, the State proved that the Defendant was a principal to the crime of aggravated battery. Viewing the evidence presented in the light most favorable to the prosecution, the evidence supports the conviction of the Defendant for aggravated battery.

2. Aggravated Escape

The Defendant also contends that the evidence presented at trial was insufficient to support his conviction for aggravated escape. The Defendant concedes that there was an escape in which he participated while he was imprisoned. However, the Defendant contends that his conviction for aggravated escape should be reduced by this court to the lesser offense of simple escape because no human life was endangered because the escape was planned in advance between the inmates and the deputies. La.R.S. 14:110(C) defines aggravated escape as follows:
C. (1) Aggravated escape is the intentional departure of a person from the legal custody of any officer of the Department of Public Safety and Corrections or any law enforcement officer or from any place where such person is legally confined when his departure is under circumstances wherein human life is endangered.
(2) Whoever commits an aggravated escape as herein defined shall be imprisoned at hard labor for not less than five years nor more than ten years and any such sentence shall not run concurrently with any other sentence.
Calvin Moore, a Deputy Sheriff and Assistant Warden at the St. Landry Parish Jail, is in charge of keeping the records of incarcerations in the parish jail. At trial, Deputy Moore identified the jail head count sheet for the third floor of the St. Landry Parish Jail from December 25, 1997. It showed that Martin Texada, Jason Edwards and Jerome Thomas were all housed in cell block C on the third floor on that date. A stipulation was entered on the record that the Defendant was legally in the custody of the St. Landry Parish Sheriff's Office on December 25, 1997. Another stipulation was also entered on the record that the Defendant was captured by the St. Landry Parish Sheriff's Office on March 2, 1998 at 11:00 in the evening in the northern part of St. Landry Parish. Therefore, it is undisputed that the Defendant was in the legal custody and confinement of the St. Landry Parish *861 Sheriff's Department on the night of the escape. There is no doubt that the escape from the prison was intentional. A departure was planned and the Defendant and two of his cell block mates carried out the plan by arming themselves with metal rods, hiding in the showers and waiting for the arrival of the guards for head count.
Justin Tezano, an inmate in cell block C on the third floor, testified at trial that the day before Christmas, Jerome Thomas was trying to get through a vent with a metal pipe and the Defendant was his lookout. After their attempt to get through the vent was unsuccessful, the Defendant made the decision to change to plan B, which was to hide in the showers and wait for the guards to come for "rack up." Jason Edwards confirmed that Jerome Thomas tried to break through the vent on Christmas Eve. Edwards admitted at trial that he left the St. Landry Parish Jail without permission or authority. He stated that it was the Defendant's idea to hide in the shower. Several other inmates who testified for the defense stated that they did not know that there was going to be an escape until they heard loud voices in the day room asking where the keys were located. One inmate, Jarod Paul Fontenot, was asked if there were a number of people in the cell block who knew that this was going to take place and stated, "Pretty much everybody." Mr. Fontenot also testified that the Defendant was instrumental in getting everybody "racked up" early that night.
The Defendant testified on his own behalf at trial. During his testimony, he stated that one of the guards, Andrew Bonvillian, approached him and told him that he could get out of jail for a small fee. The Defendant also testified that he gave money to Deputy Bonvillian and Deputy Bonvillian told him the route to take to escape. However, in a television interview played for the jury, the Defendant stated that he "busted out" of jail.
During the testimony of Vernon Marks, a detective for the St. Landry Parish Sheriff's Office, it was established that, while there were some allegations that Deputy Bonvillian had taken a bribe from the Defendant, these allegations came only from the inmates involved in the escape.
In proving that human life is endangered, it does not matter whether the offender is armed. Under statute, if the circumstances indicate beyond a reasonable doubt that human life was endangered, then that particular element of aggravated escape was sufficiently proven. State v. Desselle, 614 So.2d 276 (La.App. 3 Cir.1993). From the record, it is apparent that the lives of at least two people, Bonvillian and Stelly, were endangered by the escape of the three inmates, two of whom were armed with metal rods. One of the guards, Deputy Stelly, was beaten with a rod by one of the inmates and Deputy Bonvillian was kicked, while the Defendant searched for the keys to escape. Although the guards were locked in a secured cell block, two of the other cell blocks had not been locked down for the night. The inmates in those cell blocks were allowed to roam around in the day room without supervision because the only two guards on duty on the third floor were locked in another cell block. Also, the key taken by the escapees was the main key. It opened all of the major doors leading out of the prison and the prisoners could have allowed the whole third floor to escape because of their access to the control room of the third floor. An invitation was, in fact, offered to another prisoner to escape. However, he declined.
In State v. Thomas, 95-1646 (La.App. 3 Cir. 5/8/96); 680 So.2d 37, 46, this court found the defendant's actions in speeding away from the deputies in the courthouse parking lot to effectuate his escape proved that he committed the crime of aggravated escape because he intentionally departed from the legal custody of law enforcement officers under the circumstances wherein human life was endangered. In State v. McManus, 94-0974 (La.App. 1 Cir. 6/23/95); 658 So.2d 811, the defendant's *862 conviction for aggravated escape was supported by evidence that, during the escape, the defendant knocked the prison guard off of a stool onto the floor and then held him in a choke hold while he was handcuffed and his feet tied and then the inmates proceeded to exit the building leaving the only guard on duty in the control center tied up. Likewise, in State v. Desselle, 614 So.2d 276, this court found that the evidence supported the finding that the defendant endangered human life, for purposes of the defendant's conviction for aggravated felony escape. In that case, the defendant broke into an automobile in which the driver was present, endangering the driver when a deputy shot the defendant while he was in close proximity to the driver. The defendant in Desselle elbowed a second deputy in the face, started the car and drove away dragging the deputy along the pavement.
The record herein supports a finding that the lives of the guards were endangered while the inmates implemented their plan of escape. The guards were cursed and hollered at, threatened with metal rods. One of them was beaten. Just as in McManus, the inmates left the prison leaving the only two guards on duty on the third floor locked inside a cell block. Further, the lives of some inmates housed on the third floor were endangered because other inmates stayed up all night in the cell block day room without any immediate supervision. Therefore, the State proved all the elements of the crime of aggravated escape and the record, therefore, supports the conviction.

DOUBLE JEOPARDY
The Defendant next contends that because prosecutions for aggravated battery and aggravated escape were pursued during the same trial, his constitutional guarantee against double jeopardy was violated. The Defendant points out that the conviction for aggravated escape could be proven by the same evidence used to convict him of the crime of aggravated battery because it requires the use of physical force or endangerment of human life. He argues that he was put in double jeopardy since the same evidence was used to convict him on both charges.
This court set forth the rule concerning a claim of double jeopardy arising from a single chain of events in State v. Love, 602 So.2d 1014, 1019-1020 (La.App. 3 Cir. 1992):
The definition of double jeopardy is given in La.C.Cr.P. art. 591 which provides:
"No person shall be twice put in jeopardy of life or liberty for the same offense, except, when on his own motion, a new trial has been granted or judgment has been arrested, or where there has been a mistrial legally ordered under the provisions of Article 775 or ordered with the express consent of the defendant."
La.C.Cr.P. art. 596 provides:
"Double jeopardy exists in a second trial only when the charge in that trial is:
(1) Identical with or a different grade of the same offense for which the defendant was in jeopardy in the first trial, whether or not a responsive verdict could have been rendered in the first trial as to the charge in the second trial; or
(2) Based on a part of a continuous offense for which offense the defendant was in jeopardy in the first trial."
Both the Fifth Amendment to the United States Constitution and Article 1, § 15 of the Louisiana Constitution guarantee that no person shall be twice placed in jeopardy for the same offense. The purpose of these provisions is to protect a person from a second prosecution after he has already been acquitted or convicted of that offense and also to protect an accused against multiple punishment for the same conduct. North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); State v. Vaughn, 431 So.2d 763 (La.1983).

*863 Louisiana uses both the "Blockburger test" and the "same evidence test" in determining whether double jeopardy exists. La.C.Cr.P. art. 596; State v. Vaughn, supra, and cases cited therein. The "Blockburger test" was set out by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), where the court stated:
"... The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not..."
The "same evidence test" has been adopted by the Louisiana Supreme Court and was explained by the court in State v. Steele, 387 So.2d 1175 (La.1980), as follows:
"If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial ... The `same evidence test' is somewhat broader in concept than Blockburger, the central idea being that one should not be punished (or put in jeopardy) twice for the same course of conduct." (Citation omitted). Id. 387 So.2d at 1177 (La.1980).
Therefore, "double jeopardy provisions protect an accused not only from a second prosecution on the same offense, but also from multiple punishments for the same criminal conduct". State v. Vaughn, supra, at page 767, and cases cited therein.
However, an accused who commits separate and distinct offenses during the same criminal episode or transaction may be prosecuted and convicted for each offense without violating the principle of double jeopardy. State v. Nichols, 337 So.2d 1074 (La.1976). Louisiana has not adopted a "same transaction" test which would prohibit, on double jeopardy grounds, prosecutions for different crimes committed during one sequential, continuing course of conduct. City of Baton Rouge v. Jackson, 310 So.2d 596 (La.1975).
Love, 602 So.2d at 1019-1020. See also State v. Thomas, 95-1646 (La.App. 3 Cir. 5/8/96); 680 So.2d 37, 44-46.
One of the theories on which the State relied to prove the aggravated escape was the placing of the two deputies in fear of their lives. The bill of information charged the Defendant with having committed an aggravated battery upon the person of Deputy Stelly. The inmates, who were armed with and brandishing metal rods, also told Deputy Bonvillian to get down on the floor and he was kicked twice during the encounter. The guards were then locked in a cell block, unarmed. Additionally, during its opening statement, the State discussed several theories regarding conditions left behind by the escaping inmates which endangered human life. Although no one could get out of their cells to harm the guards, Deputy Bonvillian testified that he was still scared because he did not know where the escapees were and he and Deputy Stelly were unarmed in the cell block. It was also established at trial that approximately one hundred prisoners were left unguarded because the guards were locked up with no one to man the control room. Some of the inmates had not been locked down yet and were allowed to roam free in the day room of their cell blocks for three and a half hours. The escapees also took from the control room the main key which opened every door in the jail, allowing the prisoners access to every part of the jail. Therefore, the escape of these three prisoners not only endangered the lives of Deputies Stelly and Bonvillian, but other employees *864 of the jail and the lives of all of the inmates who were housed on the third floor without any immediate supervision. While the Defendant's claim might have had some merit if the only life endangered was that of Deputy Stelly because of the battery inflicted upon him with the metal rod, other evidence presented at trial proved that the lives of many others were placed in danger because of the actions of the Defendant.

INEFFECTIVE ASSISTANCE OF COUNSEL/EXCESSIVE SENTENCE
Finally, the Defendant contends that his trial counsel was ineffective in failing to file a Motion to Reconsider Sentence. Alternatively, the Defendant asserts that the aggravated escape sentence imposed by the trial court was cruel, unusual and excessive, in violation of Article I, § 20 of the Louisiana Constitution of 1974.
In this case, the Defendant's trial counsel failed to file either an oral or written motion to reconsider sentence. The failure to timely file a motion to reconsider sentence or to orally object at sentencing on the basis of excessiveness precludes this court from entertaining a claim of excessiveness of sentence on original appeal. State v. King, 95-344 (La.App. 3 Cir. 10/4/95); 663 So.2d 307. See also La.Code Crim.P. art. 881.1. Because the Defendant did not file a motion to reconsider sentence within the thirty-day period allotted by La.Code Crim.P. art. 881.1 or seek an extension by the trial court for the filing of the motion, he is barred from having his sentence reviewed for excessiveness and his assignment of error is not properly before this court. In the alternative, the Defendant contends that his trial counsel was ineffective in not filing the motion to reconsider his sentence because his sentence is constitutionally excessive.
A failure to file a motion to reconsider sentence does not in itself constitute ineffective assistance of counsel. However, if the defendant can "show a reasonable probability that, but for counsel's error, his sentence would have been different," a basis for an ineffective assistance claim may be found. State v. Hayes, 97-1526 (La.App. 1 Cir. 5/15/98); 712 So.2d 1019, 1022. In this case, the Defendant received the maximum sentence of ten years for aggravated escape. This is the only sentence which the Defendant seeks to have reviewed for excessiveness. At the Defendant's sentencing, the trial judge stated his reasons for the sentences as follows:
The Pre-Sentence Report indicates that he is a first felony offender; however, these are some very serious charges. The St. Landry Parish ... Investigating Officer's Report indicates that during the night hours of December 25 and 26, 1997, Martin Texada, Jerome Thomas and Jason Edwards overpowered Jailers, Michael Stelly and Andrew Bonvillian as the Officers were racking up prisoners on the third floor of the St. Landry Parish Jail. Uh, both of the Jailers were threatened with physical harm. Deputy Stelly was struck with another pipe and kicked in the side. The offenders secured jail keys; locked the jail and the cell blocks and made their way to the first floor and fled from the jail. After approximately two months all three offenders were located and recaptured and booked back into the St. Landry Parish Jail. The Defendant went to trial of his peers, before a Jury and the Jury found him guilty of both Aggravated Escape and Aggravated Battery. Uh, the lives of two St. Landry Parish Sheriff's Deputies were endangered. The Defendant escaped along with two other inmates and remained on the loose for approximately two months. A Pre-Sentence Investigation was ordered. I looked at Martin's uh, Pre-Sentence Investigation, his rap sheet. Although he has no felony convictions, he's had a number of, a number of brushes with the law, a number. Uh, Principle to Distribution of Cocaine in 92; there was no deposition *865 [sic]; Accessory to Second Degree Murderno disposition in 92; following too close with an accidentin 1992, Second Degree Murderin 93; not guilty by Jury Verdict; playing loud music94; Guilty; playing loud music95; guilty; Second Degree Batterydismissed in 95; playing loud music8/95; guilty; reckless operationplead nolo contendere, that was in the 1/96; 3/96reckless operation; 3/96improper registration; Simple Assault5/96that was nolle prosequi; uh, playing loud music on 5/96no disposition found; expired inspection stickerguilty7/96; canceled license plateguilty; cruelty to animals10/96plead nolo contendere; 7/97Attempted First Degree Murderthat's the charge that's pending also Distribution of Cocaine to Juveniles7/97, which is also pending and a Carnal Knowledge of a Juvenile6/98, which is also pending. The victims in this case first being Michael Stelly, stated that he was suspended without pay for one month. And lost $1,000 in wages. He had to borrow to support his house note and support his family. He endured a great amount of embarrassment, humiliation, mental stress as a result of the allegations made against he and Bonvillian. Uh, he indicated that his character was assassinated and his honesty was questioned during the investigation of this Trial. The offenders, TV and newspapers portrayed he and Deputy Bonvillian negatively. That was frustrating and depressing. They're recommending that uh, Martin receive the maximum sentence allowable. And Bonvillian basically made the same statement.
To find that a sentence is excessive, this court must conclude that the penalty is so grossly disproportionate to the severity of the crime as to shock the sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and, therefore, is nothing more than needless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981); State v. Everett, 530 So.2d 615 (La.App. 3 Cir.1988), writ denied, 536 So.2d 1233 (La.1989). In light of the criteria expressed by Article 894.1, a review for excessiveness of an individual sentence should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. State v. Lewis, 489 So.2d 1055, 1061 (La.App. 1 Cir.), cert denied, 493 So.2d 1218 (La.1986).
At the sentencing hearing, the trial judge stated that he had reviewed the Defendant's pre-sentence investigation report, which indicated that the Defendant was a first time felony offender. However, although the Defendant had no felony convictions, he had a history of criminal activity. The trial judge also noted that additional charges of a serious nature were pending against the Defendant, as listed above. It is appropriate in sentencing to consider a defendant's prior criminal activity, not limited to convictions. State v. Washington, 414 So.2d 313 (La.1982); State v. Desselle, 614 So.2d 276. The trial judge also provided an in depth discussion regarding the seriousness of the Defendant's actions in threatening the prison guards, striking one of them with a metal pipe and locking them in a cell block. The Defendant also remained uncaptured for approximately two months. The court also took into consideration the embarrassment, humiliation, mental stress and the loss of wages that the two prison guards had to endure because of the allegations made against them and the negative portrayals of them by the media.
In State v. Desselle, 614 So.2d 276, the trial court did not find the defendant's eight-year sentence for aggravated escape to be excessive. In that case, the trial judge was familiar with the defendant's criminal history, took into consideration the mitigating factor that the defendant did not arm himself in the escape. Further, the record established that the lives of at least two people were endangered by *866 the defendant's actions. In State v. Byrd, 491 So.2d 87 (La.App. 3 Cir.1986), the defendant's sentence of ten years for aggravated escape was held not to be excessive where the defendant had a long history of criminal involvement, he purposefully planned his escape and planned the death of a deputy to effect a "clean getaway" when such killing would have been completely unnecessary. However, in State v. House, 476 So.2d 908 (La.App. 2 Cir.1985), the Second Circuit found that the defendants' sentences of nine years for aggravated escape were not excessive because the defendants both had criminal juvenile records; the defendants were being held for charges of simple burglary, attempted burglary and possession of stolen property at the time of their escape and the seriousness of their conduct endangered the lives of the occupants of the police vehicle as well as others on the highway at the time of the offense. In House, both of the defendants were first felony offenders and did not arm themselves during the escape.
Although the Defendant received the maximum for his conviction for aggravated escape, his sentence was not excessive due to the fact that he had an extensive criminal history, he actively planned his escape and, in furtherance of this escape plan, his principals armed themselves with metal rods which they used to threaten both guards and strike one of the guards. Although he was a first felony offender, at the time of his escape the Defendant had pending against him a July 1997 charge for attempted first-degree murder, a July 1997 charge for distribution of cocaine to juveniles and a June 1998 charge for carnal knowledge of a juvenile. The Defendant also stayed uncaptured for about two months before being returned to prison. Therefore, we find that the record supports the Defendant's sentence and is not grossly out of proportion to the severity of the crime or a needless and purposeless imposition of pain and suffering.
Because the Defendant has failed to show that the motion to reconsider the sentence would have resulted in a different sentence, we cannot find that the failure of Defendant's counsel to file a motion to reconsider sentence does not constitute ineffective assistance of counsel. See State v. Lee, 26,542 (La.App. 2 Cir. 5/12/94); 636 So.2d 634.

CONCLUSION
For the foregoing reasons, the Defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] "Rack up" is a term used by the prison guards to tell the prisoners that it is time to go to bed for the night. Once the prisoners are all locked in their cells, the guards go into the cell blocks to perform a head count.
[2] One of the metal rods was found on January 17, 1998, when it was discovered by Deputy David Doucet laying flat in the ground cover surrounding the corner of the parish jail.