GENOVESE, Judge.
11After having been indicted by a grand jury in Evangeline Parish on the charge of forcible rape, Defendant, Toby Shaun Bor-delon, was convicted of the responsive verdict of attempted forcible rape by a jury on June 15, 2005. On September 15, 2005, Defendant was sentenced to serve twenty years at hard labor. After his motion for reconsideration of the sentence was denied, Defendant appealed, alleging three assignments of error: (1) insufficiency of the evidence; (2) admission of inadmissible hearsay evidence; and (3) excessiveness of sentence. For the following reasons, we affirm Defendant’s conviction and sentence, and remand the matter back to the trial court to correct the sentencing minutes.
FACTS
A review of the record indicates that on November 2, 2004, Detective Joseph De-mourelle of the Evangeline Parish Sheriff Department was advised of a possible *246 rape. The next day, the victim[1] (A.G.) went to the Evangeline Parish Sheriffs Department and was interviewed by Detective Demourelle. She related that while she was working at the Dollar General Store in Pine Prairie, Louisiana, Defendant came into the store looking for ant poison. A.G. attempted to assist Defendant by showing him where the poison was located. When A.G. noticed that there was no ant poison on the shelf, she told Defendant that she would check the storeroom for some. When she entered the storeroom, she noticed that Defendant had followed her. She advised him that he could not be in that area. A.G. stated that Defendant then grabbed her and forced her into the bathroom.
At trial, Detective Demourelle identified photos taken by him of A.G. which showed a bruise below her eye on her left cheek. A.G. advised him that this bruise | occurred when Defendant forced her between the lavatory and toilet where she struck her face on the toilet.
The detective conducted an interview with Defendant prior to taking a recorded or video statement from him. Defendant told Detective Demourelle that he knew A.G., and that he had asked her as they were walking to the, back of the store, “when are we going to get together,” or something to that effect. A.G. told him that her father would not like that, and Defendant responded that he “liked to stick to [his] own race anyway.”
Detective Demourelle testified that during the interview Defendant inquired about the crime for which he was charged and that he advised Defendant that the charge had been upgraded to rape. At that point, Defendant said he did not wish to talk anymore. He also stated that he wanted to speak to an attorney. The interview ceased.
Detective Demourelle also testified that a standard sexual assault kit completed during the medical examination of A.G. was submitted to the crime lab, along with her clothing and the suspect’s clothing. The lab was unable to detect the presence of semen.
Sergeant Zelda Deshotel, who also works for the Evangeline Parish Sheriffs Department as the parish juvenile investigator, was asked by Detective Demourelle to interview A.G., who related the following to her about the attack:
She told me that a white male subject by the name of Toby, I believe Bordelon is the last name, went into the store where she was working and asked for some ant poison that cost a $1.00 [sic] and she went and looked on the shelf and there was nothing on the shelf so she went to the stock room to see if there was any in there and when she turned around he was right behind her, he had closed the door and she told him he couldn’t be in there, he had to get out, he couldn’t be in there, and she then told me that he caught her by the shirt, dragged her to the restroom which was located in the stock room and that’s when she started telling me she tried to get to her, her box cutter to defend herself and she told | shim no, don’t do this and she had a, a bruise under her left eye, I think it was her left eye and I asked her how she got that and she said it was when he pushed her against the wall in between the toilet and the sink in the bathroom, her face hit against it and she said he held both of her hands in one of his, undid her pants, his was undone, I asked her if she *247 noticed any scars or anything unusual about his private area and she told me, only that it was hairy and she said well, I said well did he commit full penetration and did he go in, and she said about an inch and a half and something spooked him and, he stopped. So I asked her what do you think spooked him, she said she later found out, when he left her, when he got spooked, she said he just left me there laying on the ground and she said she was really nauseated and scared and crying, she went out of the stock room and she told one of the elderly women that was working there, I forget her name but it’s on the interview what had happened and she then found out at that time that a young man by the name of, I believe Stacy went in looking for Toby in the store and the other two women saw Toby in the store but now at that time that Stacy was looking for him, they couldn’t find him anywhere, so he left and so when she told me that I found that very interesting, that you know that was probably the time frame that she was being raped, that this guy went in to look for Toby and they couldn’t find him.
Amy Renee Henry, a close friend of A.G., testified that she stopped at the Dollar Store on November 1, 2004, at approximately 6:15 p.m., and saw A.G. sitting on the concrete in front of the store. Mrs. Henry recognized that something was wrong. After asking A.G. what was wrong, A.G. related basically the same story given to the detective.
A.G. stated that she had told her boss about the incident, but that her boss took no action. Mrs. Henry then saw a passing law enforcement unit, and she and A.G. followed the unit and reported the crime. A.G. also showed her where her shirt had been ripped in the incident.
Lawanna Deshotel, a co-employee of A.G., testified that when she got off work about 4:00 p.m., she observed A.G., and “her hair was messed up and she looked aggravated like, stunned or something. ...” She asked her what was wrong, and A.G. related that Defendant had attacked her in the warehouse and “tried to stick it in her.... ” Ms. Deshotel also said that she had seen the Defendant come into the|4store earlier.
Leisha Deville, the manager of the Pine Prairie Dollar Store, testified that she was advised by Lawanna Deshotel about what had happened, but that she never discussed the incident with A.G.
Dr. Charles Edward Fontenot, a family practitioner and Evangeline Parish Coroner, testified that he reviewed medical records of an examination of A.G. and that the report disclosed no objective signs of a sexual assault.
Stacy Guillory, a long time friend of Defendant, testified that on November 1, 2004, he observed Defendant’s truck parked at the Dollar Store. He stated that he entered the store and asked the cashier if she had seen Defendant and then walked throughout the store, with the exception of the bathroom and storage room area, calling out Defendant’s name. Mr. Guillory then went outside, observed Defendant’s truck still there, and walked back into the store. He was in the store twice, for a period of six or seven minutes, and did not find Defendant on either occasion.
A.G. testified that she was a high school graduate and a recent graduate of Louisiana Technical Institute, with a degree in accounting. In November, 2004, she was not sexually active. She knew Defendant only through her employment at the store. They had no personal relationship. She described him as flirtatious and related two different events: (1) when he told her to “bend over so he could look at [her] *248 butt,” and (2) when he tried to get her to go to the bathroom with him.
A.G. testified that on the date of the incident Defendant entered the store, and the cashier requested that she show him where the insecticides were located. The ant spray that Defendant wanted was not on the shelf, so she told him to wait while she looked in the storeroom. She walked into the warehouse area alone and, while stepping onto a box, noticed his presence for the first time. She stepped off the box | fiand told him that he was not supposed to be in that area. At that point, he grabbed her.
A.G. attempted to resist but was forced into the bathroom. Defendant pushed her into the sink. When she turned around, she noticed that the door was locked and his pants were undone. She removed a box cutter from her pocket to use as a weapon, but Defendant hit her hand against the wall twice, forcing her to drop it. He then asked, “What you gonna do, chop my d_k off with it?”
A.G. stated that Defendant unbuttoned and unzipped her pants, pulled them down to her knees, grabbed her in the back of the head, and slammed her into the toilet. Her face hit the toilet seat. Then, “he took his (inaudible) and he said it’s soft now but it’ll get bigger when it’s hard ... and then that’s whenever he slightly put it in and then he heard something and he left.” She testified that she was positive penetration had occurred.
A.G. also testified that she screamed for Defendant to stop throughout the ordeal. She remained in the bathroom for about fifteen minutes after he left, trying to compose herself. During this time, she was crying and nauseated. She stated that she was in shock, and could not believe what happened and that she was alive. After leaving the bathroom, she saw Lawanna Deshotel and told her that she had been attacked by Defendant and that he had tried to rape her.
A.G. testified that she asked her boss to call the police, but she did not do so. Her boss also made her finish her shift. She did not call the police herself because she was embarrassed and confused. After her shift was over, she was outside the store when her friend, Amy Henry, drove up. Mrs. Henry recognized that something was wrong and asked what happened.
While talking to Mrs. Henry, they saw Rick Ordner, a police officer from Pine 1 fiPrairie, pass by, but they were unable to stop him. They then went to his location, and he advised them to return to the store where she would be contacted by a law enforcement officer. A.G.’s father also went to the store and then brought her home. Later, her father and mother took her to the hospital to be examined.
Lawanna Deshotel testified that prior to the incident, Defendant would call the store and ask to speak to A.G. She never saw A.G. talk to him on the phone and did not have any knowledge about whether he might have called her at home.
Lawanna Deshotel testified that on the day of the incident, prior to Defendant leaving the store, he stopped to pay for his ant poison. When asked if Defendant was running, she responded, “[no], he, he was Toby, he was jittery, he’s always like that.”
Ms. Deshotel also testified about hearing a prior conversation between A.G. and Defendant’s wife. She related that A.G. asked Defendant’s wife whether she and the Defendant were still married, or separated. Previously, A.G. had said that she did not recall such a conversation. Ms. Deshotel further testified that it would be difficult to hear anything in the storeroom unless “you’re in that area right there, close, if you’re in the middle of the store or *249 the other end, you won’t be able to hear nobody.”
Lacy Bordelon, the wife of Defendant, was in the process of divorcing him at the time of trial. She testified that she and A.G. had a conversation at the register on one occasion. She testified as follows:
She asked if me and Toby were still together, I told her no, I said why and she said that he was flirting with her or made a pass at her and she wanted to know if we were still together because she didn’t think it was right if we were and I said no we weren’t and she said that he calls up there and talks to her and another worker there and also stated that ... he has been calling and talking to her.
ERRORS PATENT
In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, this court notes |7that there are no errors patent; however, there is an error in the minutes of sentencing which will be addressed later in this opinion.
ASSIGNMENT OF ERROR NO. 1
Defendant first asserts that the State failed to present sufficient evidence to support the verdict. With regard to sufficiency of the evidence, this court has held:
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982); State v. Moody, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witness. Therefore, the appellate court should not second-guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See King, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983).
State v. Lambert, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27. In order for the State to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt. “In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.” State v. Kennerson, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.
Defendant was prosecuted on the charge of forcible rape, a violation of La.R.S. 14:42.1(A)(1). Louisiana Revised Statutes 14:42.1 provides, in pertinent part:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:.
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
| ¡/Louisiana Revised Statutes 14:41 defines the act of rape, in pertinent part, as:
A. Rape is the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.
*250 B. Emission is not necessary, and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime.
Defendant was convicted of the responsive verdict of attempted forcible rape. The law of attempt is found in La.R.S. 14:27, which states, in pertinent part:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
A.G. testified that she did not consent to the sexual act. She described what followed after she first noticed that Defendant had followed her into the storeroom:
A. I noticed that he was standing next to me and I told him, I said you can’t be in here and he said it doesn’t matter, your boss won’t know and I stepped off the box and I said that’s not the point, you’re not supposed to be in here and he didn’t say anything and that’s when he grabbed me (crying) (inaudible). .
Q. He grabbed you by the collar of your shirt, and what did he do then?
A. He (inaudible) (crying) to the bathroom.
Q. Did you fight with him or did you try to resist?
A. Yes.
Q. How did you try to resist, what did you do?
A. I tried pushing him off but he kept (inaudible) (crying).
Q. Okay what happened once y’all got into the bathroom?
A. He pushed me in (inaudible) the sink with my hands and I went to turn around and the door was locked and his pants was undone.
Q. Did you have a box cutter with you? A. Yes.
|ciQ. Did you do anything with that box cutter?
A. I took it out of my pocket.
Q. Okay why did you take it out of your pocket [A.G.]?
A. Because I was going to try to defend myself.
Q. And what happened to the box cutter?
A. He hit it, he hit it against the wall twice and it fell out of my hand.
Q. It fell out of your hand. Now let’s talk about that right now, you hit your hand against the wall?
A. Yes.
Q. Okay, later on did you notice a bruise on your hand?
A. When it hit, it was like a, like a pain but it went away.
Q. Did it go away?
A. After a while, yes.
Q. So after he hit your hand on the wall you say he had his pants down?
A. Yes.
Q. And what happened next [A.G.]?
A. Then he took my hand that the box cutter was in and he made a comment.
Q. And what was that comment [A.G.]?
A. What you gonna do, chop my d_k off with it.
Q. That’s what he said?
A. Yes.
Q. What happened next?
A. Then he took my hand, opened my hand like this and he undid my pants.
Q. What type of pants did you have, jeans?
A. Khaki pants.
*251 [inQ. Khaki pants, is that kind of like a uniform that they have or not really, just your own khaki pants?
A. Yes.
Q. Okay, yes it’s a uniform?
A. It was, we had to wear uniforms at work.
Q. Okay What did he do to you next?
A. He unbuttoned it and he unzipped it.
Q. And what did he do next?
A. He pulled it down to my knees and then he grabbed me in the back of the head and slammed me up against the toilet.
Q. He did what?
A. He slammed my head up against the toilet.
Q. Okay, did you fall down at any time?
A. I, my face fell on the toilet seat.
Q. On the toilet seat?
A. Yes sir.
Q. Now the jury has seen some photographs, I still see a blemish right here underneath your left eye, was that there before November the 1st?
A. No sir.
Q. Is that still, is that the result of whenever you hit your head, your face on the toilet?
A. Yes sir.
Q. What happened next after you, after you hit your head, your face on the toilet?
A. Then, and then he took his (inaudible) and he said it’s soft now but it’ll get bigger when it’s hard.
Q. That’s what he said?
A. Yes, and then that’s whenever he slightly put it in and then he heard something and he left.
InQ. You said he put it in, he was standing behind you?
A. Yes.
Q. How, what was your position at the time, were you bent over, standing up or what?
A. Yes, my hands was [sic] touching the floor.
Q. Your hands were stuck on the floor. Now you say he stuck it in, is there any doubt that you felt his penis enter your vagina?
A. Yes I did.
Q. I said is there any doubt, are you positive that his penis entered your vagina?
A. Yes sir.
Q. Okay and did you feel the penis enter your vagina?
A. Yes.
Q. Okay would you estimate about how far his penis entered your vagina?
A. About maybe an inch.
Q. About an inch, an inch and a half or whatever that is, and there is absolutely no doubt that his penis entered your vagina?
A. Right.
Q. Okay and what happened after you felt it enter your vagina?
A. Then he just, he must have heard something and stopped.
Q. Did you hear something?
A. No.
Q. Now was he holding his hand over your mouth?
•A. No.
Q. But he was holding you (inaudible)?
A. He was holding my head down.
Q. [A.G.] did you scream out at any point and time?
I ipA- Yes.
Q. Okay but when did you scream?
*252 A. Whenever he had my hands over my head.
Q. That was in the bathroom?
A. Yes.
Q. Was the door to the bathroom, do you remember if he closed the door to the bathroom after y’all both got into the bathroom?
A. Yes, he closed it and locked it.
Q. And he locked it?
A. Yes sir.
Q. So you screamed, did he do anything to prevent you from screaming?
A. No.
Q. Did you stop screaming at any point and time?
A. No.
Q. How were your screaming, in other words what were you screaming if you recall?
A. I was telling him to stop, help, don’t, please don’t.
Q. In other words rather than screaming necessarily for help, you were screaming stop, stop, you were trying to get him to stop?
A. Yes.
Q. Rather than a shout for help?
A. Yes.
Q. If you had shouted for help, as loud as you could do you think somebody in the store could have heard if you were in the bathroom, in the storeroom with the door closed?
A. No.
Q. You don’t know but you don’t think so?
| iaA. I don’t think so.
Q. Now when he stopped, what, what did he do?
A. He just left.
As previously noted, the crime lab was unable to detect any confirmation of an emission. However, A.G. repeatedly stated that penetration had occurred. In State v. Schexnaider, 03-0144 (La.App. 3 Cir. 06/12/03), 852 So.2d 450, 457, this court held:
The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense. State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, 1045, writ denied, 99-3477 (La.6/30/00), 765 So.2d 1062 and 00-0150 (La.6/30/00), 765 So.2d 1066; State v. Hawkins, 99-217 (La.App. 5th Cir.7/2/99), 740 So.2d 768, 769; State v. Hubbard, 97-916 (La.App. 5th Cir.1/27/98), 708 So.2d 1099, 1104, writ denied, 98-0643 (La.8/28/98), 723 So.2d 415.
From A.G.’s testimony, it is clear that she was unable to resist by acts of force. She even attempted to use a box cutter to defend herself, but was overcome by force.
Based on the verdict, it is evident that the jury found the victim to be credible. All elements of the forcible rape were proven, and certainly the evidence was sufficient to support the conviction for attempted forcible rape.
ASSIGNMENT OF ERROR NO. 2
Defendant next alleges that the trial court erred in allowing Amy Henry to testify as to her conversation with A.G. two hours after the rape. He contends that his hearsay objection to the testimony should have been maintained. Defendant acknowledges that the first report of sexually assaultive behavior is an exception to the hearsay rules found in La.Code Evid. art. 801, but argues that the statement to Mrs. Henry was not the first complaint. He further urges that the statements complained of do not constitute an excited *253 utterance excepted by La.Code Evid. art. J_^803(2).
It is not necessary for this court to address this issue. Even if the complained of testimony was improperly allowed as an exception to the hearsay rule or an excited utterance, such an error would constitute harmless error. The standard for a harmless error analysis has been recognized in State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94 and State v. Jones, 98-1165 (La.App. 3 Cir. 2/3/99), 734 So.2d 670. This court held in Jones, 734 So.2d at 673:
Louisiana has adopted the harmless-error analysis stated in Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The test questions whether the guilty verdict was surely unattributable to the error. See State v. Johnson, 94-1379 (La.11/27/95); 664 So.2d 94.
A review of the record clearly indicates that the verdict in this case was unattributable to the asserted error that the trial court allowed inadmissible evidence and was, therefore, harmless.
In brief, Defendant states:
In addition to the two Dollar General employees who told the jury what A.G. said happened, the jury was told what A.G. said by Joseph Demourelle of the Evangeline Parish Sheriffs Office; Zel-da Deshotel, the parish juvenile investigator; Susan Denny, the ER nurse; Vernon Fontenot, a patrol officer; Rick Ordner, a Pine Prairie patrol officer; and Amy Henry whose testimony cannot be allowed as an “excited utterance” or as an “initial complaint.”
Appellant was denied his right to a fair trial when the jury was repeatedly told what A.G. said. The conviction in this case should be reversed for the court erred in allowing Amy Henry to provide the hearsay testimony of A.G. over defense objection.
As noted in Defendant’s brief, multiple witnesses related the same story without any significant differences. There was nothing contained in the testimony of Amy Henry that was not related by several other witnesses. The testimony of which Defendant complains was cumulative and did not contribute to the verdict. Without said testimony, all facts testified to by Amy Henry were placed before the jury | ¡¿without objection.
ASSIGNMENT OF ERROR NO. 3
Finally, Defendant argues that his sentence is excessive and that the trial court failed to comply with La.Code Crim.P. art. 894.1. He argues that the trial court failed to state the factors that were considered in sentencing which would demonstrate that a particularized sentence was given and contends that the reasons relied on by the trial court in support of the sentence were insufficient to demonstrate valid reasons for the sentence given Defendant.
This court has set forth the following standard to be used in reviewing excessive sentence claims:
La. Const, art. I, § 20 guarantees that, “[n]o law shall subject any person to cruel or unusual punishment.” To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. State v. Etienne, 99-192 *254 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, writ denied, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, cert. denied, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
State v. Barling, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, writ denied, 01-838 (La.2/1/02), 808 So.2d 331.
In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:
[An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. State v. Smith, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may |1fiprovide some insight, “it is well settled that sentences must be individualized to the particular offender and to the particular offense committed.” State v. Batiste, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge “remains in the best position to assess the aggravating and mitigating circumstances presented by each case.” State v. Cook, 95-2784 (La.5/31/96); 674 So.2d 957, 958.
State v. Smith, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, writ denied, 03-562 (La.5/30/03), 845 So.2d 1061.
In his motion to reconsider the sentence, Defendant asserted no grounds for exces-siveness other than the sentence was the maximum. The supreme court, in State v. Mims, 619 So .2d 1059, 1059-60 (La.1993), held:
If the defendant does not allege any specific ground for excessiveness or present any argument or evidence not previously considered by the court at original sentencing, then the defendant does not lose the right to appeal the sentence; the defendant is simply relegated to having the appellate court consider the bare claim of excessiveness.
As well as a general complaint of an excessive sentence, Defendant urges noncompliance by the' trial court with the provisions of La.Code Crim.P. art. 894.1. This court held in State v. Williams, 02-707, pp. 8-9 (La.App. 3 Cir. 3/5/03), 839 So.2d 1095,1100-01:
The trial court must state for the record the considerations taken into account and the factual basis for the sentence. La.Code Crim.P. art. 894.1(C). Although the trial court need not refer to every factor listed in Article 894.1(A), the record should affirmatively reflect that adequate consideration was given to codal guidelines in particularizing the defendant’s sentence. State v. Iron, 00-1238 (La.App. 3 Cir. 2/15/01); 780 So.2d 1123, writ denied, 01-1232 (La.3/15/02); 811 So.2d 898. Yet, when the trial court fails to adequately address the factors of La.Code Crim.P. art. 894.1, ‘the trial court’s reasoning alone will not necessitate the need for re-sentencing as long as an adequate factual basis is found within the record.’ State v. Butler, 98-1258, p. 7 (La.App. 3 Cir. 2/3/99); 734 So.2d 680, 684.
As set forth below, the trial court’s stated reasons fall short of the statutory requirements. The following colloquy contains the stated reasons in support of Defendant’s sentence:
|17BYTHE COURT:
*255 Alright, Mr. Bordelon would you rise please with your attorney?
Pursuant to the verdict of the jury of this Parish, they returned a verdict of guilty of Attempted Forcible Rape. I then ordered a Pre-Sentence Investigation which was presented to me yesterday by the Department of Public Safety, Probation and Parole. Pre-Sentence Investigation shows an extensive history of law violations. In accordance with that, and I have considered the guideline set out by the Code of Criminal Procedure, Article 894.1,1 find that the defendant is in need of custodial treatment or custodial environment and think it can be provided most effectively by his commitment to an institution. Any lesser sentence in what I impose will deprecate the seriousness of the defendant’s crime. The crime has caused permanent, physical, and mental anguish and damage to the victim, and for other reasons included in the Code of Criminal Procedure, Article 894.1 which sets out the guidelines.
In accordance with that Mr. Bordelon, I’m sentencing you to a term with the Department of Corrections for 20 years at hard labor. In accordance with my reasoning and at this time I’m going to enter the Plea Bargain Agreement into the record and advise you that this is a crime of violence for which you will be required to serve 85% of the time.
BY MR. CHAPMAN:
Your Honor we would request that the Court reconsider the sentence just imposed in that [sic] is the maximum sentence.
BY THE COURT:
Yes it is the maximum. I understand that, I’m going to deny your Motion, I’m also going to advise you Mr. Bordelon that pursuant to the Code of Criminal Procedure, Article 930.8 there’s a two year prescriptive period within for [sic] which for you [sic] to apply for Post Conviction Relief which begins today from the time of finality of this judgment.
BY MR. CHAPMAN:
Your Honor we would also wish to make an Oral Motion for Appeal on both the conviction and the sentence to be substituted with a written Motion.
BY THE COURT:
You’re certainly entitled to that. If you will prepare your Orders asking for the Appeal it will be prepared, I will sign it and I will order |18the preparation of the transcript.
BY MR. BORDELON:
So I can appeal this case?
BY THE COURT:
Pardon
BY MR. BORDELON:
I can appeal this case?
BY THE COURT:
Yes you can appeal it.
BY MR. BORDELON:
That’s good, Ville Platte’s gonna owe me a lot of money for this.
BY THE COURT:
And another reason for this sentence let the record reflect that at no time did Mr. Bordelon show any remorse or contrition for his act.
Even though the trial court failed to fully comply with La.Code Crim.P. art. 894.1, there exists ho reason for re-sentencing Defendant since the record provides an adequate factual basis, as set forth below. Furthermore, Defendant’s sentence is not so grossly disproportionate to the severity of the crime as to shock our sense of justice, nor is the sentence such that it makes no measurable contribution to acceptable penal goals, or that it is *256 nothing more than needless imposition of pain and suffering.
Although charged with forcible rape, Defendant was convicted of the responsive verdict of guilty to attempted forcible rape. Defendant’s sentence of twenty years is the maximum sentence that can be given for attempted forcible rape. In determining this to be the appropriate sentence, the trial court stated its reliance on the pre-sentence report.
The pre-sentence report indicates that Defendant has a juvenile record, an extensive criminal history, and prior convictions on two felonies: theft over five hundred dollars and second degree battery. The report also indicates that Defendant is a second felony offender. His conviction on both prior felonies occurred on the same date. At the time of the instant crime, Defendant was on active probation.
This court has recognized that consideration of a defendant’s criminal history at sentencing is not limited to convictions. State v. Texada, 98-1647 (La.App. 3 Cir. 5/5/99), 734 So.2d 854. In this case, although not all charges ended in convictions, Defendant’s prior arrests include discharging a firearm in the city limits, simple assault, violation of a protective order, resisting an officer, purse snatching, and stalking.
Defendant’s date of birth is December 31, 1975. Although his juvenile history is not shown, his criminal history reflects twenty-six arrests since he turned eighteen. The pre-sentence report emphasizes the fact that a number of Defendant’s criminal acts were crimes against the person. Also, Defendant’s commission of the instant crime, while on probation for recent felony convictions, supports a finding that probation was ineffective.
The evidence established that Defendant was excessively violent in his attack on the victim. He grabbed her, forced her into the bathroom, and pushed her face into the toilet. When she tried to retrieve her box cutter to defend herself, Defendant repeatedly smashed her hand into the wall until it fell to the floor.
Although convicted of an attempt, the evidence fully supports a finding of guilt on the charge of forcible rape. In State v. Myers, 495 So.2d 411, 414 (La.App. 3 Cir.1986), this court held:
Defendant urges that the sentencing court erred in imposing the maximum sentence because it felt defendant was guilty of murder even | anthough the jury returned a manslaughter verdict. We disagree.
The sentencing court is charged with viewing every circumstance surrounding the offense committed, and should impose a sentence fitting defendant’s conduct. See: State v. Lanclos, 419 So.2d 475 (La.1982). Even though in the case sub judice defendant was found guilty of manslaughter, it was not improper for the sentencing court to consider defendant’s actual conduct. State v. Hayes, 466 So.2d 767 (La.App. 4th Cir.1985), writ denied, 469 So.2d 982 (La.1985); State v. Williams, 430 So.2d 114 (La.App. 3rd Cir.1983), writ denied, 435 So.2d 449 (La.1983).
See also State v. Schexnaider, 03-144 (La.App. 3 Cir. 6/4/03), 852 So.2d 450.
In Schexnaider, 852 So.2d 450, this court also considered the effect of the potential for a penalty for sentencing as a habitual offender, even if a bill of information had not been filed. As previously noted, Defendant is classified as a second felony offender. In accordance with La. R.S. 15:529.1(A)(l)(a), Defendant would have faced a minimum sentence of ten years to a maximum of forty years as a habitual offender. Although he received the maximum sentence for the crime for *257 which he was convicted, his sentence was only half of his potential exposure as a habitual offender.
The pre-sentence report also disclosed that A.G. experiences repeated nightmares, suffers from panic seizures, for which she takes medication to help, and has problems sleeping. She remains depressed, has problems with relationships, and has lost weight. She not only had medical expenses at the time of the pre-sentence report, but remained under medical treatment with the expectation of incurring additional expenses.
The report fails to disclose any mitigating circumstances, other than Defendant’s child support obligation. His history clearly reflects his disregard for the law and a strong probability that he will re-offend. As noted by the trial court, Defendant failed to show any remorse for his acts.
| st In this case, this court finds that extensive incarceration is necessary to protect society. Defendant’s angry outburst at the sentencing hearing, directed at the community in general, also demonstrates his anger and the possibility of potential future harm to the victim.
This court finds that the record presents an adequate factual basis to support Defendant’s sentence and that there was no abuse of the trial court’s broad sentencing discretion.
Correction of Minutes
The minutes in this matter state that the “court finds the defendant is to serve 85% per cent [sic] of his sentence.” According to the sentencing transcript, however, the trial court stated:
In accordance with that Mr. Bordelon, I’m sentencing you to a term with the Department of Corrections for 20 years at hard labor. In accordance with my reasoning and at this time I’m going to enter the Plea Bargain Agreement into the record and advise you that this is a crime of violence for which you will be required to serve 85% of the time.
(Emphasis added). The emphasized words — “advise” and “crime of violence”— are pertinent and were left out of the minutes of the sentencing hearing. The designation of an offense as a crime of violence is required by La.Code Crim.P. art. 890.1, which “apparently was designed to provide assistance to the Department of Safety and Corrections (DOC) in determining diminution of sentence for good behavior under La.[R.S.] 15:571.3 or eligibility for parole under La.[R.S.] 15:574.4 B.” State v. Allen, 99-2898, p. 2 (La.6/16/00), 762 So.2d 615, 616. Because it is pertinent, the trial court’s designation of the crime as a crime of violence must be included in the minutes. Therefore, this case is remanded to the trial court with instructions to amend the minutes of the sentencing hearing to accurately reflect that this is a crime of violence for which Defendant must serve 85% of his time.
| ^CONCLUSION
In summary, the evidence in this case was sufficient to support the conviction. The testimony alleged to be inadmissible hearsay testimony was cumulative and, even if hearsay, constituted harmless error. Finally, the sentence imposed was not excessive.
Both the conviction and sentence of Defendant are affirmed. The case is remanded to the trial court with instructions to correct the minute entry as set forth above.
CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTIONS.

. The victim will be referred to herein as A.G., to protect her identity, in accordance with La.R.S. 46:1844.